**COMMONWEALTH OF PENNSYL-
VANIA et al., Plaintiffs,**

v.

**James T. LYNN et al., Defendants.**

**Civ. A. No. 990–73.**

United States District Court,
District of Columbia.

July 23, 1973.

William A. Dobrovir, Andra N. Oakes, Washington, D. C., for all plaintiffs.

Herbert M. Franklin, of counsel for Plaintiffs.

Israel Packel, Atty. Gen. of the Commonwealth of Pennsylvania, Barry S. Kohn, Deputy Atty. Gen. of the Commonwealth of Pennsylvania, Stephen C. Miller, Michael Golden, Asst. Attys. Gen. of the Commonwealth of Pennsylvania, Norman C. Amaker, New York City, Mollie W. Neal, Chevy Chase, Md., for National Committee Against Discrimination in Housing.

Carl J. Character, Cleveland, Ohio, for Neighbors Organized for Action in Housing, Inc.

Stephen J. Mathes, Philadelphia, Pa., for Tioga Nice-town Community Development Corp. and Harriet Tubman Community Organization.

George D. Gould, Philadelphia, Pa., for Concerned City-wide Homeowners.

David H. Moskowitz, Cornwells Heights, Pa., for Bucks County Interfaith Housing Corp.

Raymond M. Seidel, Norristown, Pa., for Sandy Hill Terrace, Inc.

Gerald M. Hershenson, Morrisville, Pa., for Galilee Village, Inc.

Frederick Lee Ruck, Fairfax County Atty., William E. Donnelly, III, Asst. County Atty., for intervening plaintiff Board of Supervisors of Fairfax County, Virginia.

Harlington Wood, Jr., Asst. Atty. Gen., Harold H. Titus, Jr., U. S. Atty., Harland F. Leathers, David Epstein, Dept. of Justice, for the defendants.

## INTRODUCTION

CHARLES R. RICHEY, District Judge.

This suit was initially brought by the Commonwealth of Pennsylvania, the Maine State Housing Authority, five non-profit corporations which claim to be potential sponsors of FHA subsidized housing, and various community and civil rights organizations, purportedly on behalf of all others similarly situated. A later Motion to Intervene as a Party Plaintiff, brought by the Board of Supervisors of Fairfax County, Virginia, was also granted. The Plaintiffs seek declaratory and injunctive relief to compel the defendants, James T. Lynn, Secretary of the Department of Housing and Urban Development (HUD), and Roy L. Ash, Director of the Office of Management and Budget (OMB), to begin reprocessing pending or new applications for federal financial assistance in the Section 235, 236 and rent supplement programs [1] which were suspended by the Secretary of HUD on January 8, 1973. Plaintiffs contend that they are directly aggrieved by Defendants' suspension of these programs and that Defendants' actions will prevent the completion of Plaintiffs' proposed projects and the inception of any new ones under the applicable statutory programs. They allege that HUD is required to continue implementation and operation of these programs and that the Secretary's action is unlawful, unconstitutional and discriminatory.

Plaintiffs have filed Motions for Preliminary Injunction and Summary Judgment. The latter Motion seeks to make permanent the relief sought in the former, namely, the permanent enjoining of Defendants from refusing to accept applications for subsidies, to process existing and new applications in accordance with the Defendants' own regulations and to approve and complete the processing of those projects found by Defendants to be qualified under Defendants' own regulations. It also seeks to have Defendants' suspension of Section 235, 236 and rent supplement programs and their refusal to accept new applications or process applications pending on that date declared unlawful. Defendants have filed a Motion to Dismiss and/or for Summary Judgment upon the ground that Plaintiffs have failed to state a claim upon which relief can be granted in that the Court lacks jurisdiction over the subject matter of the action. For the reasons stated below, the Court has determined that Plaintiffs' Motion for Summary Judgment should be granted.

## I. BACKGROUND

In 1949, Congress declared that the general welfare of the nation requires major federal efforts to assist private industry and local public bodies in achieving "the realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family . . . ", and directed HUD's predecessor to carry out this policy.[2] In 1968, Congress reaffirmed this goal and directed its achievement by, *inter alia,* the construction and rehabilitation in the decade 1968–1978 of six million units of low and moderate income housing.[3] Sections 235, 236 and 101 of the Housing and Urban Development Acts were enacted in implementation of this goal.

Sections 235, 236 and 101 are administered by the Secretary of HUD, and provide federal subsidies for housing constructed by private enterprise for low and moderate income families. Section 235, 12 U.S.C. § 1715z, assists lower income families to buy newly constructed, rehabilitated or existing homes by providing mortgage insurance and periodic assistance payments to mortgagees that reduce the effective mortgage interest rate to as low as one per cent.[4] Section 236, 12 U.S.C. § 1715z–1, affords subsidized rental housing opportunities to

---

1. 12 U.S.C. §§ 1715z, 1715z–1, and 1701s, respectively.

2. 42 U.S.C. § 1441.

3. 42 U.S.C. § 1441a; 12 U.S.C. § 1701t.

4. 12 U.S.C. § 1715z(c)(2).

lower income families in newly constructed or rehabilitated buildings, by providing mortgage insurance and periodic interest reduction payments to mortgagees on behalf of nonprofit or limited profit sponsors of such housing.[5] Under both of these sections, the Secretary of HUD is authorized to make contracts with the mortgagees for the assistance payments.[6] Section 101 assists tenants of privately owned federally assisted projects whose income would otherwise qualify them for low-rent public housing, by providing periodic rent supplement payments to the owners of such private projects.[7] Contracts are made by HUD with qualified housing owners for such payments.[8]

Housing constructed or rehabilitated under these programs is built by private for-profit or non-profit "sponsors" and, if rental or coop, managed by private non-profit sponsors. A private sponsor wishing to build Section 235, 236 or 101 housing must make extensive financial and organizational commitments before it can obtain a Feasibility Letter, in the case of Section 236, or a Fund Reservation, in the case of Section 235, which constitutes the government's initial indication that a project may be eligible for approval.[9] If an application for Section 236 housing is approved after the applicant's submission of detailed plans and specifications, HUD will issue a Firm Commitment providing that it will insure a mortgage note in a specified amount for the project. A Firm Commitment for Section 235 Housing is made on a unit-by-unit basis only after the housing unit is completed and the home-purchaser located.

---

5. 12 U.S.C. § 1715z–1(c) provides for the amount of such payments.

6. 12 U.S.C. § 1715z(a) ; 12 U.S.C. § 1715 z–1(a).

7. 12 U.S.C. § 1701s(d) provides for the amount of such payments.

8. 12 U.S.C. § 1701s(a).

9. Such commitments may include owning an option on the site, obtaining basic in-

On January 8, 1973, then Secretary of HUD Romney issued orders to all regional HUD offices terminating the Section 235, 236 and 101 programs. The orders provided that as of January 5, 1973 no more applications would be accepted for projects under the programs; that no feasibility letters or fund reservations would be issued for applications already on file; and that no conditional or firm commitments would be- issued for any project unless a feasibility letter or fund reservation had already been issued prior to the close of business on January 5, 1973. As of this time, the total amount of unobligated contract authority available for Section 235, 236 and 101 programs and thus withheld by the Defendants is $431,040,000.[10]

## II. THE CLASS ACTION ISSUE

*A. The Court Will Certify This Matter As a Class Action Under Rules 23(b)(1)(A), 23(b)(1)(B) and 23(b)(2) of The Federal Rules of Civil Procedure.*

Plaintiffs have filed an Amended Complaint seeking to bring this action on their own behalf and on behalf of all others similarly situated. Defendants argue that the class action allegations should be dismissed as unmanageable because of the mass of unidentifiable members of the alleged class.

■ The Court is of the opinion that this matter is properly maintainable as a class action on behalf of all those who have participated in efforts to obtain nondiscriminatory access of minority and low and moderate income persons to statutorily created housing subsidy, mortgage loan insurance and rent sup-

---

formation about the site, the surrounding community and the market, and preparing a general outline of the type, size and estimated costs of the project it is proposing to construct.

10. U. S. Dept. of Housing & Urban Development, Summary of the HUD Budget, Fiscal Year 1974, p. HPMC 1–6 (1973).

plement programs and particularly those applicants or potential applicants for Section 235, 236 or 101 subsidies whose applications have not been or will not be processed, or who have been or will be deterred from filing such applications by virtue of the Defendant Secretary's order of January 8, 1973. The prerequisites of Rule 23(a) are clearly met.[11] There is a commonality of interest in the basic question of law involved, i. e., whether the actions of the Secretary in suspending the subsidy programs were lawful, and the basic fact common to the members of the class is simply that no applicant can have his application considered as long as Defendants' order is in effect. Moreover, Plaintiffs' suit fits appropriately into several of the molds available under Rule 23(b). It is appropriate under Rule 23(b)(1)(A) in that the prosecution of separate actions by members of the class will create the risk of inconsistent adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the Defendants. It is appropriate under Rule 23(b)(1)(B) in that an adjudication as to the individual Plaintiffs alone will as a practical matter be dispositive of the interests of other members of the class not parties to the litigation. It is appropriate under Rule 23(b)(2) in that Defendants have acted on grounds generally applicable to the class, thereby making appropriate injunctive or declaratory relief with respect to the class as a whole. Finally, while the Court does not view this action as one brought primarily to vindicate the denial of a civil right, the situation presented and the type of relief sought are closely analogous to a civil rights suit, and the use of the class action in civil rights contexts is so widespread as to not require citation.

11. Rule 23(a) lists four prerequisites to maintaining a class action: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class,

## III. THE MERITS OF PLAINTIFFS' CASE: ISSUES

This case is ripe for action on the parties' Motions for Summary Judgment. The Plaintiffs' Motion for Preliminary Injunction has been extensively briefed and argued in open court, and the parties have supplemented their arguments in their Motions for Summary Judgment. The issues raised by the various Motions are basically the same, and the Court discerns no genuine issue of material fact.

Numerous issues have been raised by both sides to this litigation, but the answers to two of them are dispositive. The first of these basic issues is whether the Secretary had the discretion and authority in the administration of the Section 235, 236 and 101 programs to suspend their operation for program related reasons. The second is whether the Secretary's actions are a usurpation of legislative authority granted to Congress by Article I of the Constitution.

## IV. DISCUSSION

A. *Plaintiffs Have Been Directly Aggrieved by the Secretary's Order of January 8, 1973, and As Such Have Standing to Maintain This Suit.*

At the outset, the Court is met with Defendants' contention that Plaintiffs lack standing to bring this litigation in that they have not been directly aggrieved by the actions of the Defendants. Defendants argue that because HUD has not made any final commitments to any of the Plaintiffs, and since the Secretary's order was a "suspension" rather than a "termination" of the programs, Plaintiffs' claims of direct injury are merely speculative. This argument would apply, of course, to all members of the class defined in II.A., *supra.*

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

In Sierra Club v. Morton, the Supreme Court stated that "the 'injury in fact' test [of standing] requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." [12] It is difficult for the Court to understand how anyone could be more injured by the actions of the Defendants than the present Plaintiffs. Indeed, if the Court were to accept the Defendants' contentions it is clear that no one would be in a position to challenge the Secretary's actions for lack of standing. Many of the Plaintiff private organizations have been or intended to be non-profit sponsors of Section 235, 236 and 101 housing. They have expended time, money and effort in submitting or preparing to submit applications for subsidies under these programs. Likewise, the public Plaintiffs have expended time and money in fostering sponsorship of and encouraging applications for federally assisted housing projects, including Section 235 and 236 programs. All of the Plaintiffs are directly interested in obtaining nondiscriminatory access of minority and low and moderate income persons to statutorily created housing subsidy, mortgage loan insurance and rent supplement programs. Much of the time and money expended by these Plaintiffs in reliance on the HUD programs will be wasted by the actions of the Defendants. It would be speculative for the Court to attempt to determine how many of the Plaintiff sponsors would ultimately qualify for financial assistance under the HUD programs. It is not speculative to find under the present status quo that none of the Plaintiffs will receive any assistance at all. There is no question but that these Plaintiffs have a "direct stake" in the outcome of this litigation.[13]

B. *Defendants' Defenses of Sovereign Immunity, "Political Question" And Lack of Justiciable Controversy Are Without Merit.*

■ Defendants have also raised the arguments that this action is barred as an unconsented suit against the sovereign, and that it presents a political question beyond the competence of the Court. In support of the former, Defendants cite the general rule as stated by the Supreme Court in Land v. Dollar to the effect that a suit is against the sovereign if "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration."[14]

It is clear, however, that the relief sought in this litigation will not have these effects, since such amounts of money as may be involved have already been appropriated by Congress. Moreover, the doctrine of sovereign immunity is inapplicable since Plaintiffs allege that the Defendants' actions were beyond the scope of their statutory authority and were unconstitutional.[15] Finally, Plaintiffs are seeking review of administrative action pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701–706, which constitutes another exception to the doctrine of sovereign immunity within this Circuit,[16] and par-

12. Sierra Club v. Morton, 405 U.S. 727, 732, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972).

13. Sierra Club v. Morton, *supra*, at 740, 92 S.Ct. 1361.

14. 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209 (1947).

15. Dugan v. Rank, 372 U.S. 609, 621–622, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963) ; Larson v. Domestic & Foreign Commerce Corporation, 337 U.S. 682, 689–690, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949) ; City of New York v. Ruckelshaus, 358 F.Supp. 669 (C.A.No. 2466–72, D.D.C. May 3,

1973), appeal docketed No. 73–1705, June 22, 1973 ; Local 2677 AFGE v. Phillips, 358 F.Supp. 60 (C.A.No. 371–73, D.D.C. April 11, 1973), appeal docketed No. 73–1656, June 11, 1973.

16. Constructores Civiles de Centroamerica, S. A. v. Hannah, 148 U.S.App.D.C. 159, 459 F.2d 1183 (1972) ; Knox Hill Tenant Council v. Washington, 145 U.S.App. D.C. 122, 448 F.2d 1045, 1052 (1971) ; Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859, 873 (1970) ; Local 2677 AFGE, *supra* ; City of New York, *supra*.

tially provides the basis for the Court's jurisdiction over this action.

■ Defendants' contention that this litigation presents a political question and as such is nonjusticiable is similarly without merit. Basically, Defendants assert that the Court is being asked to supervise and direct the actions of the Legislative and Executive branches of the Government, that the issue of the Executive's power to determine the manner in which funds are expended is a question which is "essentially political in nature," and that there is a lack of judicially discoverable and manageable standards for resolving the dispute, citing, *inter alia*, Powell v. McCormack and Baker v. Carr as authorities for these propositions.[17] The issues in this case, however, concern the power of the Secretary to act under statutory programs already passed by Congress, and his power to act under the Constitution. The moneys in question have already been appropriated and the relief which Plaintiffs seek would only require Defendants to accept and process applications for such moneys, rather than the immediate disbursement of funds.[18] Clearly it is within the province of the Judicial branch to determine the nature of the Congressional mandate and whether the Defendants have refused to comply with that mandate. This case does not present a nonjusticiable political question.

C. *The Congressional Mandate Does Not Permit the Suspension of Section 235, 236 and 101 Programs, but Requires Their Continuation.*

■ Defendants contend that the Secretary of HUD has discretion in the administration of the housing programs presently at issue and the authority to suspend activities for program related reasons. It is asserted that HUD experienced difficulty in administering these programs in a manner consistent with Congressional intent as to the income groups to be served by the programs and the availability of program benefits in all parts of the United States. Because of this difficulty, the Defendants argue that the Secretary, in a proper exercise of his discretion, suspended the operation of the housing programs pending further re-evaluation. The results of a re-evaluation study will allegedly be ready for presentation to Congress by early September, 1973.

The fact that the Secretary is dissatisfied with these programs is immaterial if the Congressional mandate requires that they be operated on a continuing basis. The relevant statutes and legislative history demonstrate such a mandate.

Congress' first declaration of national housing policy was Section 2 of the Housing Act of 1949, 42 U.S.C. § 1441, the foundation for all later federal housing assistance. Section 2 states in part:

"The Congress hereby declares that the general welfare and security of the Nation and the health and living standards of its people require housing production and related community development sufficient to remedy the serious housing shortage, the elimination of substandard and other inadequate housing through . . . *the realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family.* . . . The policy to be followed in attaining the national housing objective hereby established

---

17. 395 U.S. 486, 518, 89 S.Ct. 1944, 23 L.Ed. 491 (1969) ; 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

18. To this extent, the case of Housing Authority of the City and County of San Francisco v. United States Department of Housing and Urban Development, 340 F.Supp. 654 (N.D.Cal.1972), is · distinguishable from the case at bar. In *Housing Authority*, the plaintiffs sought an order which apparently would have required the executive to spend the full amount of appropriated funds. The court, finding no standards by which it could "determine when or whether a breach of executive duty has occurred," dismissed the action.

shall be: (1) private enterprise shall be encouraged to serve as large a part of the total need as it can; (2) governmental assistance shall be utilized where feasible to enable private enterprise to serve more of the total need. . . . The Department of Housing and Urban Development . . . *shall exercise [its] powers, functions, or duties under this or any oter law, consistently with the national housing policy declared by this Act and in such manner as will facilitate sustained progress in attaining the national housing objective hereby established.* [Emphasis added]

Congress set the specific goal of production of 17–18 million housing units. This was a "specific congressional charge and directive to the administrative agencies of the Federal Government", and was to be attained by 1960.[19] The goal, however, was not met, and Congress acted again in 1965 by enacting the Housing Act of 1965, which funded and improved existing programs to keep them "in full operation."[20] The 1965 Act also created the rent supplement program, § 101, 12 U.S.C. § 1701s.

Despite these efforts, the housing crisis continued to worsen, and Congress responded by enacting the Housing and Urban Development Act of 1968, the chief provisions of which were Titles I and II, which added sections 235 and 236 to the National Housing Act; 12 U.S.C. §§ 1715z, 1715z–1. Section 1601 of the HUD Act of 1968, 42 U.S.C. § 1441a, was a Congressional finding that the housing crisis was continuing, reaffirmed the 1949 qualitative goal and established a new quantitative goal of "the construction or rehabilitation [of] . . . six million [housing units] for low and moderate income families" by 1978. More specifically, section 2 of the 1968 Act, 12 U.S.C. § 1701t, provided:

"The Congress affirms the national goal, as set forth in section 1441 of Title 42, of 'a decent home and a suitable living environment for every American family'.

"*The Congress finds that this goal has not been fully realized for many of the Nation's lower income families*; that this is a matter of grave national concern; and that there exist in the public and private sectors of the economy the resources and capabilities necessary to the full realization of this goal.

"The Congress declares that in the administration of those housing programs authorized by this Act which are designed to assist families with incomes so low that they could not otherwise decently house themselves, and of other Government programs designed to assist in the provision of housing for such families, *the highest priority and emphasis should be given to meeting the housing needs of those families for which the national goal has not become a reality*; and in the carrying out of such programs there should be the fullest practicable utilization of the resources and capabilities of *private enterprise* and of individual self-help techniques."

The Section 235, 236 and 101 programs involved in this litigation were precisely those enacted to implement this "highest priority", the goal of a "decent home and suitable living environment" for "lower income families", through the preferred means of "private enterprise". These programs were the essential tool for accomplishing the quantitative goal of the construction or rehabilitation of six million housing units for low and moderate income families by 1978.

Each year after 1968, through Fiscal Year 1973, Congress has increased the funding of Section 235, 236 and 101 programs. The initial authorization of funds for Sections 235 and 236 was a total of $600 million, $300 million for each

---

19. S.Rep.No.84, 81st Cong., 1st Sess., 1949 U.S.Code Cong.Serv. pp. 1550, 1555, 1568, 1559.

20. H.Rep.No.365, 89th Cong., 1st Sess., 1965 U.S.Code Cong. & Admin.News, p. 2614.

program.[21] The 1968 Act also authorized an increase up to $290 million for Section 101 rent supplements.[22] By 1972, the total grants authorized for Section 235 were $890 million, for Section 236 $925 million, and for Section 101 $433 million. Appropriations have likewise kept pace, and in Fiscal Year 1973, the cumulative total for Section 235 programs was $665 million, for Section 236 programs $700 million, and for Section 101 programs $330 million.[23]

Among the President's roles under the HUD Act of 1968 was the requirement of Section 1602, 42 U.S.C. § 1441b, that he submit to Congress, in January 1969, a detailed plan "to be carried out over a period of ten years [June 30, 1968, to June 30, 1978] for the elimination of all substandard housing and the realization of the goal . . . ." Section 1603, 42 U.S.C. § 1441c, required the President to submit, in each of the ten years, a detailed annual progress report. Section 1603(2) provides that if the objectives for any year set in the ten year plan have not been met, the President shall tell the Congress in his next annual report "the reasons for such failure, . . . the steps being taken to achieve the objectives of the plan" during the rest of the ten year period, and "any necessary revision in the objectives." The reason for this objective was

"that the stating in definite terms of annual minimum housing goals with this added requirement of giving specific reasons in case they are not met, can do much toward achievement of

the volume and stability of housing production that is so essential to the orderly growth of the country."[24]

This recitation of legislative history indicates a clear intent on the part of Congress that the programs involved in this litigation were enacted to operate on a continuing basis in order to move the country closer to its housing goals. The actions of the Secretary have frustrated that clear intent. Two months after the Secretary's action, Congress described the harm to the national housing program:[25]

"[Subsidized] housing starts for FY 75 will be virtually zero even if it is decided to reactivate the program at the expiration of the . . . moratorium. Once all the units in the pipeline are constructed, it will take at least another year to reach meaningful housing production levels."

The distinction which the Defendants have attempted to draw between this case and other cases which have overturned Executive branch determinations to terminate or suspend programs contrary to Congressional enactment is without merit, for whether the Secretary's suspension of these housing programs is program related or not, the simple fact is that the programs are not in operation.[26] This fact is not consistent with express Congressional policy.

Plaintiffs have not requested the Court to order the Defendants to expend *all* of the funds appropriated for these programs, nor does the statutory scheme mandate such expenditure. The Secretary has the discretion to accept or

---

21. P.L. 90–448, §§ 101(a), 201(a), 82 Stat. 477, 498 (1968).

22. *Id.*, § 202(a).

23. U.S. Dept. of Housing & Urban Development, Summary of the HUD Budget, Fiscal Year 1974, p. HPMC 1–6.

24. S.Rep. 1123, 90th Cong., 2d Sess. 120 (1968).

25. Joint Economic Committee of the Congress of the United States, Subcommittee on Priorities and Economy in Govern-

ment, Housing Subsidies and Housing Policy, 93rd Cong., 1st Sess. at 4 (March 5, 1973).

26. Among the decisions to date which have overturned Executive branch determinations to terminate or suspend programs contrary to Congressional enactment, authorization and appropriation are: State Highway Commission of Missouri v. Volpe, 479 F.2d 1099 (C.A.8, 1973); Berends v. Butz, 357 F.Supp. 143 (D.Minn.1973); City of New York v. Ruckelshaus, supra; Local 2677 AFGE v. Phillips, supra.

**1372**

refuse approval of particular applications in accordance with statutory and regulatory criteria. He does *not* have the discretion to refuse to process such applications, or suspend the operations of the housing programs regarding applicants who qualify to receive housing subsidies. If a decision to suspend or terminate these programs is made, it shall be made by Congress. The decision of the Secretary to suspend them was in excess of his authority and contrary to law and the Court has jurisdiction under 28 U.S.C. § 1361 to compel him to perform his duty.

D. *The Secretary's Actions Violate The Duties Imposed On The Executive By Article II Of The Constitution.*

■ When the programs involved in this litigation were suspended, then Secretary Romney, in a speech delivered on January 8, 1973, indicated the reasons underlying the suspension. He stated that what the Executive branch desired was a "searching evaluation, and hopefully new program enactment."[27] While Congress was evaluating whether to enact new programs, the existing programs would be stopped—there would be no "business as usual."[28] These activities were followed up by the President, who submitted the budget for the fiscal year ending June 30, 1974 without requesting any new money for Section 235, 236 and 101 programs.[29] In an explanatory address to the nation on March 4, 1973, the President proposed that a number of programs, including those involved in this action, would be replaced by revenue sharing. Meanwhile, while honoring "commitments al-

ready made . . . we are stopping programs which have failed."[30]

■ The constitutional question raised by these actions is simply whether the Executive, for whatever reasons, may refuse to carry out an Act of Congress. The Court finds unpersuasive Defendants' arguments that the challenged actions are in accordance with powers granted to the Executive by Article II of the Constitution. It is certainly true that such powers have long been interpreted as broad grants of authority necessary to the fulfillment of the many and varied duties imposed upon the President and the Executive branch. It is not true that the Executive has the authority to terminate or suspend indefinitely a statutory program such as that involved here for the reason that Congress may see fit to alter those programs at some date in the future. Congress has mandated that the programs continue. It is not within the discretion of the Executive to refuse to execute laws passed by Congress but with which the Executive presently disagrees.[31]

## V.  CONCLUSION

In their original Complaint, Plaintiffs alleged that Defendant Ash as Director of the Office of Management and Budget has the authority and responsibility for the apportionment of funds including contract authority approved by Congress in appropriations acts and has refused to apportion funds appropriated for the Section 235, 236 and 101 programs. Defendants have stated that OMB does not apportion obligational authority to enter into long term commit-

27.  Remarks Prepared for Delivery by George Romney, Secretary U. S. Department of Housing and Urban Development, 29th Annual Convention Exposition of the National Association of Home Builders, January 8, 1973, Plaintiffs' Exhibit 2, at 7.

28.  *Id.* at 7.

29.  HUD FY 74 Budget, *supra.*

30.  President's Radio Address on Community Development Section of His State of

the Union Message, March 4, 1973, Plaintiffs' Exhibit 4.

31.  See Kendall v. United States ex rel. Stokes, 12 Pet. 524, 37 U.S. 522, 9 L. Ed. 1181 (1838) ; Youngstown Sheet & Tube v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) ; Local 2677, AFGE v. Phillips, supra ; National Council of Community Mental Health Centers, Inc. v. Weinberger, (C.A.No.1223–73, D. D.C. June 28, 1973).

ments under these programs,[32] and as no showing has been made by the Plaintiffs on this issue, Defendant Ash's Motion for Summary Judgment will be granted.

Defendant Lynn's Motion to Dismiss or for Summary Judgment will be denied. An Order will be entered with this Opinion granting the Plaintiffs' Motion for Summary Judgment and related relief as against the Defendant Lynn, which, *inter alia*, directs that said Defendant shall continue the Section 235, 236 and 101 housing subsidy programs as mandated by Congress.

32. Affidavit of Paul O'Neill, Associate Director for Human and Community Affairs, Defendants' Exhibit B.