365 F.Supp. 1355 (1973)
COMMUNITY ACTION PROGRAMS EXECUTIVE DIRECTORS ASSOCIATION OF NEW JERSEY, INC., a nonprofit corporation of the State of New Jersey, et al., Plaintiffs,
v.
Roy L. ASH, Director of Office of Management and Budget, et al., Defendants.
Civ. No. 899-73.
United States District Court, D. New Jersey.
August 28, 1973.
*1356 *1357 David H. Ben-Asher, Elliot M. Baumgard, East Orange, N. J., for plaintiffs.
George Mittelholzer, Mark Dembling, Asst. U. S. Attys., Newark, N. J., Laurie Streeter, Dept. of Labor, Washington, D. C., for defendants.
GARTH, District Judge:
This action was commenced on June 25, 1973 by the filing of a Verified Complaint and an Order to Show Cause. Asserting jurisdiction under 28 U.S.C. §§ 1331 and 1361, plaintiffs  on behalf of themselves and all those similarly situated  allege that defendants have violated a duty to obligate and spend $270.7 million in summer Neighborhood Youth Corps ("NYC") funds appropriated by Congress for Fiscal 1973.[1]
On June 28, 1973, the return date of the Order to Show Cause, plaintiffs moved for a preliminary injunction which would restrain the defendants from allowing the NYC funds to revert to the United States Treasury without having been spent.[2] Pursuant to 28 U.S. C. § 1361, plaintiffs further sought a writ of mandamus ordering defendants to comply with the Economic Opportunity Act of 1964 as amended ("EOA"), 42 U.S.C. § 2701 et seq., Pub.L. 88-452, with the First Supplemental Appropriations *1358 Act of 1973, Pub.L. 92-607, 86 Stat. 1498, and with Article II, section 3 of the United States Constitution.
On June 28 I conducted an evidentiary hearing and considered the affidavits, briefs and oral argument submitted by both sides. Because there were no material issues of fact, other than the precise amount of the alleged congressional appropriation (Tr. 10-13),[3] the trial on the merits was consolidated with the hearing on the injunction. Fed.R.Civ. P. 65(a)(2). I made preliminary findings of fact and rendered an oral opinion and order on June 28, but reserved the right (Tr. 132), which I now exercise, to issue a written opinion upon receipt of complete sets of findings of fact and conclusions of law from the parties.[4]

I. Standing

As a preliminary matter, defendants argue that none of the plaintiff Community Action Agencies[5] have requested funding of their summer 1973 NYC programs, so that no case or controversy exists. It is uncontested that no funding request has been submitted to the Department of Labor. However, defendants have presented no evidence that the failure to request funding was improper, and I find that prior practice with regard to the NYC program involved the Department's inviting applications from the Community Action Agencies, with the Agencies only then submitting formal applications. No such invitations were made by the Department in 1973 (Tr. 28-30). Therefore, the failure of the Community Action Agencies to have requested funding is not a bar to this action.
Defendants further argue that plaintiffs generally lack standing to maintain this action. The test to be applied in order to determine whether plaintiffs have standing under Article III of the Constitution is "whether the party has alleged such a `personal stake in the outcome of the controversy' . . . as to ensure that `the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution.'" Sierra Club v. Morton, 405 U.S. 727, 732, 92 S.Ct. 1361, 1364, 31 L.Ed. 2d 636 (1972); Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 20 L.Ed.2d 947, (1968); Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).
The individual plaintiffs Maryann Weston and Yvette Young would be receiving salaries from the summer NYC were it not for the defendants' actions, since they had been tentatively accepted into the NYC program and would have been finally accepted once the funds became available (Tr. 128-29). This direct economic injury resulting from defendants' actions gives these plaintiffs personal stakes in the outcome of the controversy, and therefore confers standing upon them. Scripps-Howard Radio v. FCC, 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229 (1942); FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 60 S. Ct. 693, 84 L.Ed. 869 (1940).
The 22 plaintiffs who are the Executive Directors of Community Action Agencies of New Jersey designated to administer the summer NYC program,[6] are suing only in their official *1359 capacities. The Executive Directors have not alleged loss of their employment as a result of defendants' action. Compare American Federation of Gov't Employees v. Phillips, 358 F.Supp. 60 (D.D.C.1973). Indeed, since the United Community Corp. of Newark, the Paterson Task Force for Community Action and the Union County Anti-Poverty Council appear not to administer NYC funds (Exhibit 1 attached to Verified Complaint), their Directors are not adversely affected within the meaning of Sierra Club v. Morton, supra, 405 U.S. at 739, 92 S.Ct. 1361, and they do not have standing here. However, the remaining 19 are suing as Directors of agencies specifically established by the Executive Branch to administer funds appropriated by Congress for programs mandated by Congress. They have expended time and money fostering sponsorship of and encouraging applications for the NYC program. See Pennsylvania v. Lynn, 362 F.Supp. 1363 (D.D.C. 1973). As such, these 19 have more than a mere interest in the relief sought by this action and are within the zone of interests adversely affected by defendants' action. ICC v. SCRAP, 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 2416, 37 L.Ed.2d 254 (1973); Doe v. Bolton, 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973); Citizens Committee for Hudson Valley v. Volpe, 425 F.2d 97 (2d Cir. 1970); Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608 (2d Cir. 1965). Cf. Sierra Club v. Morton, supra, 405 U.S. at 739, 92 S.Ct. 1361. These 19 Directors have standing.
The plaintiff Community Action Programs Executive Directors Association of New Jersey and the plaintiff NYC Directors Association are not organizations whose members are injured as individuals. Compare NAACP v. Button, 371 U.S. 415, 418, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); American Federation of Gov't Employees, supra. Nor are the organizations themselves adversely affected by defendants' action. They therefore lack standing to sue.

II. Class Action Certification

Pursuant to Fed.R.Civ.P. 23(b) (2), plaintiffs have established the prerequisites for two classes. One class consists of all individuals eligible, qualified and designated as participants in NYC programs for the summer of 1973. The other class comprises all Community Action Agencies established and qualified under the EOA, which sponsor summer NYC programs. For both of these classes joinder of all members is impractical, since Agencies in all 50 states sponsor programs which in 1972 employed over 600,000 youths. Questions of law and fact are common, and plaintiffs' claims are typical, since only one nation-wide program is involved. Plaintiffs will adequately protect the interests of the class, since the individual plaintiffs would be direct beneficiaries if they succeed here, and since the Agencies, in 1972, expended $3,398,227.46 for their own programs, and would spend a similar amount if they succeed here.[7] Defendants have refused to act on grounds generally applicable to the class, since all funds have been withheld throughout the entire nation.[8]

III. Justiciability

Defendants contend that the instant cause of action presents a political question or is otherwise not justiciable. Baker v. Carr, 369 U.S. 186, 217, 82 S. Ct. 691, 710, 7 L.Ed.2d 663 (1962), set *1360 forth the definition of a political question:
"Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question."
See also Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). The questions presented to this court are whether Congress has specifically appropriated funds for the summer NYC program, and if so, whether the Executive Branch is obligated to spend the funds. There is nothing in the Baker Court's definition that leads me to find a political question herein presented. As in actions challenging administrative agency determinations alleged to be beyond or in violation of Congressional mandates, there is herein involved a dispute between the Executive and the Legislative Branches, but "the judicial branch has the function of requiring the executive (or administrative) branch to stay within the limits prescribed by the legislative branch." Nat'l. Automatic Laundry & Cleaning Council v. Shultz, 143 U.S.App.D.C. 274, 443 F.2d 689, 695 (1971).
Whether a dispute is otherwise justiciable depends upon whether "[1] the duty asserted can be judicially identified and [2] its breach judicially determined, and [3] whether protection for the right asserted can be judicially molded." Baker v. Carr, supra, 369 U.S. at 198, 82 S.Ct. at 700.
Duty. First, I conclude that the duty asserted by plaintiffs  the duty of the Executive Branch to obligate and expend funds appropriated by Congresscan be identified by examining Article II, section 3 of the Constitution, and the common law. Under Article II, section 3, the President "shall take Care that the Laws be faithfully executed . . .". The Executive Branch has no authority, even for motives such as the control of inflation, to decide for itself whether to obey a law after the President has signed a bill into law, or after Congress has overridden a Presidential veto. See, Nat'l. Council of Community Mental Health Centers v. Weinberger, 361 F. Supp. 897 (D.D.C.1973). In Kendall v. United States, 12 Pet. 524, 37 U.S. 524, 611, 9 L.Ed. 1181 (1838), the Supreme Court held that the Postmaster General could not refuse to pay a claim of an individual who had contracted to carry the mails once Congress had specifically directed payment. More recently, in Youngstown Sheet & Tube v. Sawyer, 343 U.S. 579, 587, 72 S.Ct. 863, 867, 96 L.Ed. 1153 (1952), the Court held unlawful an executive seizure of steel mills:
"In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker. The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad. And the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute . . .. The Constitution does not subject this lawmaking power of Congress to presidential . . . supervision or control."
Finally, during the recent series of "impoundment cases," it was held that the Executive Branch, in order to control inflation, had no right to withhold a state's authority to obligate apportionments from the Highway Trust Fund, contrary to a specific congressional intent that the funds be spent. State *1361 Highway Com'n v. Volpe, 347 F.Supp. 950 (W.D.Mo.1972), aff'd, 479 F.2d 1099 (8th Cir. 1973). In American Fed. of Gov't Employees v. Phillips, supra, it was held in a context similar to the one herein involved:
"The Director of OEO has discretion in funding individual C[ommunity] A[ction] A[gencies] under section 221 itself, subject to conditions imposed by lawful regulations. The Director further must establish controls to insure the financial responsibility of CAA's 42 U.S.C. § 2835 (1970). But these provisions to insure the functional and fiscal integrity of an ongoing section 221 program do not give the Director the discretion to halt that section 221 program for reasons unrelated to the purposes of the Economic Opportunity Act."
See also City of New York v. Ruckelshaus, 358 F.Supp. 669 (D.D.C.1973); Campaign Clean Water v. Ruckelshaus, 361 F.Supp. 689 (E.D.Va.1973).
I conclude, therefore, that once Congress has appropriated funds for a specific program, the Executive Branch has a duty to spend them. It has no authority under the Constitution to refuse to spend those funds, and performs only a ministerial function.[9]See Wilbur v. Kadrie, 281 U.S. 206, 218, 50 S.Ct. 320, 74 L.Ed. 809 (1930); Pennsylvania v. Lynn, supra.
Breach. Having concluded that the Executive Branch must obligate and expend funds appropriated for specific programs by the Legislative Branch, determination of the breach requires this court to undertake two tasks. The first, which will be discussed below in conjunction with the merits, is determining whether Congress in fact appropriated funds for the summer 1973 NYC program. The second, which I have already determined, is that defendants have not obligated and expended the funds allegedly appropriated. Consequently, the second prong of the Baker test of justiciability presents no bar to this court's consideration of this action.
Protection. Assuming Congress to have appropriated the funds in question, protection of plaintiffs' rights requires only that this court issue the writ of mandamus, or grant the declaratory judgment, or issue the injunction requested by plaintiffs. Defendants contend, however, that this action is an unconsented-to suit against the sovereign, and that the doctrine of sovereign immunity requires the suit's dismissal.
The general rule is that "a suit is against the sovereign if `the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration' . . . or if the effect of the judgment would be `to restrain the government from acting, or to compel it to act.'" Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963). See also Hawaii v. Gordon, 373 U.S. 57, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963). For two reasons, this action is not "against the sovereign." First, it is asserted by plaintiffsand I so holdthat the Legislature appropriated funds and thereby compelled executive action. The judgment of this court will therefore not expend itself on the Treasury or compel action, City of New York, supra; American Federation of Gov't Employees, supra; Nat'l Council of Community Mental Health Centers, supra. Defendants cite Housing Authority v. HUD, 340 F.Supp. 654 (N.D.Calif. 1972), and Commonwealth v. Connor, 248 F.Supp. 656 (D.Mass.1966), which become apposite only if this court concludes as did those courts that the Congress had not required the Executive Branch to spend the disputed funds.
The second reason that this action is not "against the sovereign" is *1362 that the defendants here represent only the executive portion of the government. Only where executive officials act pursuant to valid congressional dictates  i. e. only where the Executive and the Legislative Branches act jointly  is the doctrine of sovereign immunity available as a defense.
Even if this action were a suit against the sovereign, there are two well-settled common law exceptions to any resulting immunity, Dugan v. Rank supra, 372 U.S. at 621, 83 S.Ct. at 1007. The exceptions are "action by officers beyond their statutory powers," and action within the scope of statutory powers for which "the powers themselves or the manner in which they are exercised are constitutionally void." See also Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 689, 69 S.Ct. 1457, 1461, 93 L.Ed. 1628 (1949). Assuming a congressional appropriation for the summer 1973 NYC program, this action would fall within both of Dugan's exceptions.[10]See also Pennsylvania v. Lynn, supra.

IV. Merits: Legislative History

42 U.S.C. § 2740(a) states that the "Director [of the Office of Economic Opportunity (`OEO')] may provide financial assistance in urban and rural areas for comprehensive work and training programs or components of such programs," including the NYC. However, after choosing which programs to fund, "all work and training component programs . . . shall be consolidated into the comprehensive work and training program, and financial assistance for such components shall be provided to the prime sponsor . . ." 42 U.S.C. § 2740(b). See also 1967 U.S. Code Cong. and Admin.News 2441. Congress extended the life of these Title I programs by amending 42 U.S.C. § 2771, Pub.L. 92-424, 86 Stat. 688, to substitute the word "eight" for "three:"
"The director [of OEO] shall carry out the programs under this Title during the fiscal year ending June 30, 1967, and the eight succeeding fiscal years. . . ."
At the same time, Congress expressed its intent to add to the Administration's funding requests for the NYC program. 1972 U.S.Code Cong. and Admin.News 3235. In addition, the First Supplemental Appropriations Act for Fiscal 1973, Pub.L. 92-607, 86 Stat. 1498, appropriated $829,862,000 plus reimbursements for all Title I programs, including the NYC.
Further evidence of the congressional intent that there be a summer NYC program, arises from the history of congressional action in 1973. After the Administration specifically requested that the summer 1973 NYC appropriation be rescinded, the House Committee on Appropriations on May 3, 1973 (in its report on the Second Supplemental Appropriations Bill for Fiscal 1973) declined to adopt the proposed rescission. On May 18, 1973, the Senate Committee on Appropriations acted likewise on the same Bill, reporting:
"The Committee is aware that, while awaiting Congressional action on the proposed rescission, the funds in question have not been released. The Committee expects that these funds will be released and obligated before the close of the Fiscal Year."
Conference Report H.R. 93-293 (PX-8).[11] On June 27, 1973 Congress passed the Bill without approving the requested NYC rescission. After a Presidential veto based upon a rider to the Bill pertaining to the bombing of Cambodia, the Bill was passed again in relevant part *1363 unaltered, but with the bombing proviso deleted, and then signed into law.
Congress therefore clearly intended to fund the summer NYC program for Fiscal 1973. However, three funding levels appear in the legislative history. Assistant Secretary of Labor Malcolm Lovell, addressing the House Appropriations Committee on April 12, 1972, testified that the Fiscal 1973 appropriation would be the same as the Fiscal 1972 appropriation, conceded by the defendants to have been $270.7 million (PX-10). Lovell made the same comment while testifying before the Senate Appropriations Committee in connection with the First Supplemental Appropriations Bill for Fiscal 1973 (PX-4). The identical sum also appears as a line item in Dept. of Labor Manpower AdministrationManpower Training Services Programs Available to Individuals by Age (PX-2).
A second sum, that of $256.5 million, was mentioned when Lovell addressed the House Appropriations Committee in connection with the same First Supplemental Appropriations Bill for Fiscal 1973 just referred to (PX-5). Senator Jacob Javits (R.N.Y.), the prime sponsor of the Appropriations Bill, then referred to this second sum on the Senate floor, in a letter to the President dated June 21, 1973 (which urged release of the funds) (PX-1), and also in Congressional Record entries of March 27 and May 29, 1973 (PX-9).
The third sum mentioned was $239,143,000. While requesting a rescission of the summer 1973 NYC funds, Associate Assistant Secretary of Labor Richard Miller testified during Senate hearings on March 14, 1973 to the Administration's understanding that Congress intended $239,143,000 to have been earmarked for the summer 1973 NYC program as a component of the lumpsum appropriation of $829,862,000 (for all labor-management programs) by the First Supplemental Appropriations Bill for Fiscal 1973 (PX-6). Defendant William Koleberg, Assistant Secretary of Labor, stated in an affidavit dated June 27, 1973 and filed in this action that $239,143,000 of the $829,862,000 had been appropriated for the summer 1973 NYC program.
I conclude that Congress appropriated at least $239,143,000 for the program in question. Apparently, the other two sums ($270.7 million and $256.5 million) represent mistakes by their proponents, or include funds from other Title I programs or from the overall NYC program, of which the summer program is but a part. If, however, either or both of the parties discover additional support for one of the larger sums, then a motion may be made to alter the order I will issue below.

V. Subject-Matter Jurisdiction

Jurisdiction is asserted pursuant to 28 U.S.C. §§ 1331 and 1361. Although this action arises from an Act of Congress and therefore presents a federal question, the two individual plaintiffs cannot allege the $10,000 amount in controversy needed to avail themselves of § 1331. The 19 Executive Directors with standing, however, each administer NYC funds well in excess of $10,000 and may therefore rely upon § 1331.
Under § 1361, no jurisdictional amount need be asserted, but that section does not authorize injunctive or declaratory relief. McQueary v. Laird, 449 F.2d 608 (10th Cir. 1971). Therefore, with respect to the individual plaintiffs and the class they represent, I have jurisdiction only to issue a writ of mandamus. In view of my decision on the merits of this action, any writ of mandamus I issue will not impermissibly direct the performance of discretionary acts by the defendants or their agents. See McQueary v. Laird, supra; Minnesota v. Weinberger, 359 F.Supp. 789 (D.Minn.1973).

VI. Conclusion

In view of my foregoing findings of fact and conclusions of law, I will sign an Order to the effect that the defendants shall no later than 10:00 A.M. on *1364 June 30, 1973 record as an obligation of the United States the funds appropriated by Congress for the summer 1973 NYC program. Defendants will be enjoined and restrained from taking any action which would permit these funds from reverting to the Treasury, and will be ordered to release the funds forthwith. Defendants will also be ordered to retain all such funds as an obligated balance against the congressional appropriation until further order of this court or until released and expended.
The parties will submit an appropriate written order.
NOTES
[1] Fiscal Year 1973 ended at midnight, June 30, 1973.
[2] If not "obligated" by the end of Fiscal 1973, the funds in question would have reverted to the Treasury. 31 U.S.C. § 701(a)(2); First Supplemental Appropriations Act, supra, Chapter XI, section 1101.
[3] Transcript references are to the hearing of June 28, 1973.
[4] In this opinion, the findings of fact have been consolidated with the conclusions of law.
[5] Community Action Agencies are designated under the Economic Opportunity Act of 1964, 42 U.S.C. § 2701 et seq., to act as the prime sponsors of NYC programs under Title I, Part B of the Act. 42 U.S.C. § 2737 et seq. Under Title I, the Agencies receive grants and contracts from the Department of Labor for the summer NYC program, which cannot function without those funds. The summer NYC program provides comprehensive work and training for youths from low-income families in the form of employment, on-the-job training and useful experience. 42 U.S.C. § 2740(a).
[6] New Jersey's Community Action Agencies expended $3,398,227.46 for the summer 1972 NYC program. The funds were distributed by the Department of Labor pursuant to a delegation agreement of April 12, 1968, entered into by the Department and the Office of Economic Opportunity. (Verified Complaint, Exhibit 1).
[7] See note 6 supra. During the summer of 1972, $270.7 million was distributed nationally to sponsoring agencies for the summer employment of 600,300 youths in the NYC program (Verified Complaint Exhibit 1).
[8] It was not contested that as of the final hearing in this matter on June 28, 1973, the defendants had not obligated, released or expended any funds for the summer 1973 NYC program, or that the defendants had no intention of releasing any portion thereof.
[9] Although the issue is not properly before me at this time, it would appear that the only discretion retained by the Executive Branch after a legislative appropriation is that over how and where to spend the funds. American Federation of Gov't Employees, supra.
[10] This action is similar to those brought under the Administrative Procedures Act, 5 U.S.C. § 701 et seq., which has been held to constitute a waiver of sovereign immunity. Scanwell Laboratories v. Shaffer, 137 U.S. App.D.C. 371, 424 F.2d 859, 873 (1970). See also Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L. Ed.2d 136 (1971). Plaintiffs, however, have not cited the Act to this court.
[11] "PX.." refers to numbered Plaintiffs' Exhibits.