**SEAFARERS INTERNATIONAL UNION OF NORTH AMERICA, AFL–CIO, Plaintiff,**

v.

Caspar **WEINBERGER**, Secretary of Health, Education & Welfare, et al., Defendants.

Civ. A. No. 1077–73.

United States District Court, District of Columbia.

July 30, 1973.

---

Ronald Rosenberg, Washington, D. C., for Seafarers International Union of North America.

John T. Boese, Atty., Dept. of Justice, Washington, D. C., for Caspar Weinberger, and others.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN H. PRATT, District Judge.

The above case having come on for a hearing before the Court upon plaintiff's application for a preliminary injunction, on July 27, 1973, and the parties having appeared and having been afforded the opportunity to present evidence, and after hearing oral argument by counsel and due deliberation having been had thereon, I make the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. The plaintiff, Seafarers International Union of North America, AFL–CIO (hereinafter SIU) is and has been at all times herein relevant a "labor organization", to wit, an unincorporated association, consisting of thirty-two affiliated bodies whose members include, *inter-alia*, thousands of seamen employed by United States flag deep-sea, Great Lakes, inland waters and fishing vessels, whose principal office is at 675 Fourth Avenue, Brooklyn, New York, and it maintains an office at 2000 L Street, N. W., Washington, D. C. within the territorial jurisdiction of this Court.

2. Defendant Caspar Weinberger is and at all times relevant herein has been the Secretary of Health, Education and Welfare of the United States (hereinafter Secretary).

3. Defendant Charles C. Edwards is and has been at all relevant times herein the Assistant Secretary for Health.

4. Defendant Robert E. Streicher is and has been the Director of the Federal Health Program Service, Health Services and Mental Health Administration, Department of Health, Education and Welfare, which is responsible for the administration of the United States Public Health Service (hereinafter PHS), which provides hospital and medical care for beneficiaries entitled or authorized to receive such care under the Public Health Service Act of 1944, 58 Stat. 682, 42 U.S.C. § 201 et seq., (as amended) P. L. 92–585, 86 Stat. 1292.

5. The seamen members of SIU and its affiliated organizations are seamen as defined in 42 U.S.C. § 201(h) and by reason thereof are entitled to medical, surgical and dental treatment and hospitalization without charge at PHS hospitals and stations pursuant to 42 U.S.C. § 249.

6. At all times relevant herein, the PHS has been and is operating general hospitals at the following locations: Baltimore, Maryland; Boston, Massachusetts; Norfolk, Virginia; Staten Island, New York; Galveston, Texas; New Orleans, Louisiana; Seattle, Washington and San Francisco, California.

7. That seamen, including seamen members of plaintiff, have historically received and have been entitled to receive medical care and hospitalization without charge, provided by the United States government, for more than one hundred seventy years, and such seamen have come to depend on these essential health services.

8. That the Congress has protected the benefits to seamen and other PHS beneficiaries, and has required the Department of Health, Education and Welfare to maintain the PHS hospitals and clinics (Public Health Service Act of 1944, *supra*, §§ 321, 322); that Congress has since the enactment of the 1944 Act reiterated upon several occasions its intent that the PHS hospitals

be kept open and that PHS beneficiaries continue to receive the medical care and treatment to which they have become accustomed. See House Report 89–610, 89th Congress—1st Session, p. 18; Senate Concurrent Resolution 6 (Cong. Record—Senate S1302, February 11, 1971).

9. The legislative intent to maintain the PHS hospital system is further borne out by two opinions of the Comptroller-General of the United States (Decision B–156510, February 23, 1971; letter of the Comptroller-General of June 7, 1965 to the Chairman, House Committee on Merchant Marine and Fisheries). The more recent of these two opinions states:

"It is therefore our opinion that under the 1944 Public Health Service Act, the Congress intended that the hospital system characteristic of the Service since its inception in 1802 with the Marine Hospital is to be operated and maintained by the Service in order to carry out the functions and duties imposed by the 1944 Act. In light of the foregoing, the Secretary may not, in our view, use his discretionary powers under the 1944 Public Health Service Act or the Federal Property and Administrative Services Act of 1949 to effect the closing of all PHS hospital facilities by means of the transfer of these institutions to non-federal ownership." (Opinion B–156510, *supra*, p. 7)

10. In 1972, Congress enacted the Emergency Health Personnel Act Amendments of 1972, P.L. 92–585, 86 Stat. 1292 (hereinafter P.L. 92–585). Grave concerns were expressed by various groups, including community health care institutions, that the Department of Health, Education and Welfare planning reflected a desire to dispose of the PHS hospitals in the most expeditious way, rather than a genuine concern to provide continued quality health care to PHS beneficiaries and other members of the communities in which the PHS facilities are located. (See Senate Report No. 92–1062, p. 11, quoted *infra*, U.S.Code Cong. & Admin.News 1972, p. 4832).

Congress in Section 3 of P.L. 92–585 specifically provided that the Secretary could not close or transfer control of any PHS facilities unless he transmitted to each House of Congress a detailed explanation for the proposed closing or transfer, which explanation contained assurances of continued equivalent care and treatment for affected PHS beneficiaries, an estimate of the cost of providing such care and treatment after the proposed closing or transfer, and the comments made by each state or local area-wide health planning agency with respect to the proposal, after each such agency had been provided with a reasonable opportunity to review and comment on the proposed closing or transfer. Additionally, the Secretary was required to wait a period of ninety calendar days of continuous session of Congress from the date of transmission of the explanation to Congress, before taking any steps to effectuate the proposed plan, during which period Congress could review and study the proposal and take action with respect thereto.

11. The legislation (Section 3, P.L. 92–585) does not constitute in any way a retreat from the established Congressional policy requiring maintenance of the PHS hospital system. It manifests the intent of Congress that before action can be taken to close any PHS hospital the Secretary must carefully study his action and take all steps necessary to assure that each PHS beneficiary affected by the proposed action continue to receive equivalent care and treatment. It further manifests the intent of Congress that it have the opportunity to study the plan and take appropriate reaction with respect thereto. The legislative history of P.L. 92–585 makes this clear. The House Committee Report (Report No. 92–1547) on the bill states (at p. 7):

"Since in the past Congress has not been adequately informed when the U.S. Public Health Service has, or has proposed to, close or transfer an individual facility of the U.S. Public Health Service, the legislation requires that hospitals and clinics must

remain open unless prescribed procedures are followed. Whenever the ·Public Helath Service proposes to close or transfer any hospital or facility of the Service they would under this legislation be required to submit to each house of the Congress an explanation of the proposed action 90 days in advance of taking such action. It is anticipated that this 90 day period of notice will in the future, unlike the past, provide the Congress with an adequate period during which to review any proposed closure or transfer, and, if necessary, to take whatever action is felt to be appropriate upon the proposal . . . .

"In notifying the Congress the Secretary will be required to submit an explanation of the proposal. The explanation must include assurances that beneficiaries entitled to care and treatment at the facility proposed to be closed or transferred will continue to receive equivalent care and treatment . . ."

The Senate Committee Report on the legislation contains similar statements manifesting the intent to retain the benefits historically provided to seamen and other PHS beneficiaries, and to require approval of the Congress of any plan for closure or transfer of PHS facilities submitted by the Secretary. The Senate Report (Report No. 92–1062) states (at p. 11):

"The bill requires that wherever practical, the facilities, equipment and supplies of the Public Health Service Hospitals and Clinics be utilized to serve areas with critical health manpower shortages . . . It is clearly the Committee's intent that these existing PHS facilities be utilized to the greatest extent practical to serve these areas, for the dual purpose of serving the area and improving the utilization of these facilities.

"The bill requires that any plan to close or transfer control of the Public Health Service Hospitals and Clinics contain assurances that this change will not impair the overall capacity to deliver health services to shortage areas in the vicinity and an explanation of how residents of these areas will be provided care after the closure or transfer. It is the Committee's intent that the Secretary give close study to these questions. Preliminary DHEW plans received by the Committee to date for PHS Hospitals give little or no consideration to these issues in spite of the provisions in S.Con. Res. 6 and the words in the Senate Report on that Resolution clearly indicating the Committee's intent in this regard. By writing this requirement into law, the Committee makes clear its intent that the Secretary make every effort to use these Public Health Service facilities to serve these shortage areas and that any plans for the future of these facilities give every possible consideration to such use.

"The Committee also intends that DHEW shall continue quality health care services to Federal beneficiaries and other members of the communities in which these facilities are located, as well as important training and research programs carried on in these facilities. To date, DHEW planning for these facilities has left beneficiary groups fearful that changes in the status of the hospitals will diminish the availability, quality, and responsiveness of the health services offered them. At the same time, community health care institutions and consumer groups have expressed grave concern that DHEW's planning is motivated more by the desire to dispose of these facilities in the most expeditious way possible than the desire to enhance the community's capacity to supply the kind of health services it most needs.

"To assure that the Secretary gives due regard in his planning to these concerns on the part of the beneficiaries and the local community, the bill requires that the Secretary give a detailed explanation to Congress 90 days in advance of any closure or transfer. This explanation must assure continuation of services and pro-

grams, and it must contain approvals by the State and local planning agencies established under Sections 314 (a) and 314(b) of the Public Health Service Act." U.S.Code Cong. & Admin.News 1972, p. 4842.

12. On March 28, 1973, the Secretary, pursuant to Section 3, P.L. 92–585, submitted to each House of Congress a detailed explanation for the proposed closure of in-patient and related research services at six of the eight PHS hospitals, as of July 21, 1973, the date when the ninety-day period required by P.L. 92–585 expired. The detailed explanation took the form of a "Plan for Provision of In-patient Service to Public Health Service Hospital Beneficiaries Through Contact With Community Hospitals."

13. Following transmittal of the proposal to Congress, in each House bills were introduced to foreclose the Secretary from proceeding to effectuate the Plan, and requiring the continued operation of the PHS hospitals. In the House, H.R. 6881 was introduced by Representative Adams on April 12, 1973, and H.R. 7448 was introduced on May 2, 1973. Senator Magnuson's proposed amendment to S. 504, the Emergency Medical Services Systems Act of 1973, was passed on May 15, 1973, by the Senate. In addition, hearings were held by the House Committee on Merchant Marine and Fisheries at which the Secretary and his staff appeared and presented a prepared statement as well as testimony, all of which indicated it was the Secretary's intention to shut down entirely the PHS hospital system and administratively discontinue the program of medical care and treatment established by Congress for merchant seamen nearly two centuries ago.

14. On July 10, 1973, the unanimous report of the Conference Committee on the Emergency Medical Services Systems Act of 1973 was ordered to be printed. That Report (Report No. 93–370) contains the recommendations of the Committee of Conference on the disagreeing votes of the two Houses on the amendments of the House to the bill (S. 504) to amend the Public Health Service Act in certain respects, including maintenance of the PHS hospital system. The bill as unanimously recommended by the Conference Committee provides, in pertinent part, that:

"Sec. 5. (a) Except as provided in subsection (b), the Secretary of Health, Education and Welfare shall take such action as may be necessary to assure that the hospitals of the Public Health Service, located in Seattle, Washington, Boston, Massachusetts, San Francisco, California, Galveston, Texas, New Orleans, Louisiana, Baltimore, Maryland, Staten Island, New York, and Norfolk, Virginia, shall continue—

"(1) in operation as hospitals of the Public Health Service,

"(2) to provide for all categories of individuals entitled or authorized to receive care and treatment at hospitals or other stations of the Public Health Service inpatient, outpatient, and other health care services in like manner as such services were provided on January 1, 1973, to such categories of individuals at the hospitals of the Public Health Service referred to in the matter preceding paragraph (1) and at a level and range at least as great as the level and range of such services which were provided (or authorized to be provided) by such hospitals on such date, and

"(3) to conduct at such hospitals a level and range of other health-related activities (including training and research activities) which is not less than the level and range of such activities which were being conducted on January 1, 1973 at such hospitals.

"(b)(1) The Secretary may—

"(A) close or transfer control of a hospital of the Public Health Service to which subsection (a) applies,

"(B) reduce the level and range of health care services provided at such a hospital from the level and range required by subsection (a)(2) or change

**1058**

the manner in which such services are provided at such a hospital from the manner required by such subsection, or

"(C) reduce the level and range of other health-related activities conducted at such a hospital from the level and range required by subsection (a)(3),

"if Congress by law (enacted after the date of the enactment of this Act) specifically authorizes such action.

"(2) Any recommendation submitted to the Congress for legislation to authorize an action described in paragraph (1) with respect to a hospital of the Public Health Service shall be accompanied by a copy of the written, unqualified approval of the proposed action submitted to the Secretary by each (A) section 314(a) State health planning agency whose section 314(a) plan covers (in whole or in part) the area in which such hospital is located or which is served by such hospital, and (B) section 314(b) areawide health planning agency whose section 314(b) plan covers (in whole or in part) such area.

"(3) For purposes of this subsection, the term 'section 314(a) State health planning agency' means the agency of a State which administers or supervises the administration of a State's health planning functions under a State plan approved under section 314(a) (referred to in paragraph (2) as a 'section 314(a) plan'); and the term 'section 314(b) areawide health planning agency' means a public or nonprofit private agency or organization which has developed a comprehensive regional, metropolitan, or other local area plan or plans referred to in section 314(b) (referred to in paragraph (2) as a 'section 314(b) plan').

"(c) Section 3 of the Emergency Health Personnel Act Amendment of 1972 is repealed."

The Committee of Conference unanimously and explicitly rejected the Plan submitted by the Secretary to Congress on March 28, 1973, as wholly failing to satisfy the requirements of Section 3, P.L. 92–585. The report stated (at p. 29):

"The conferees were aware, in adopting these provisions, that the DHEW had submitted a 90-day notice of proposed closure of in-patient services in some of the affected hospitals. While the notice was submitted pursuant to the requirements of P.L. 92–585, the conferees felt that it did not meet the requirements of that law in that it did not present a plan assuring competent care to PHS beneficiaries."

I note further that no contracts with community hospitals have been entered into by the PHS.

15. The bill (S. 504) containing the above-quoted provisions, as recommended by the Committee of Conference, was passed by the House of Representatives on July 17, 1973, by a vote of 306 to 111, and unanimously by the Senate on July 19, 1973, by a vote of 97–0. It is now awaiting presidential action.

16. On July 18, 1973, this Court, upon application of the Plaintiff, on notice to Defendants, and after argument by counsel, granted a temporary restraining order enjoining the Defendants from taking any action, direct or indirect, to effectuate the Plan of March 28, 1973, or from taking any action which would impair, diminish or otherwise adversely affect the benefits currently provided to PHS beneficiaries at PHS hospitals, pending the hearing and determination on Plaintiff's motion for a preliminary injunction.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter of the action pursuant to 5 U.S.C. § 702; 28 U.S.C. § 1331; 28 U.S.C. § 1361 and 28 U.S.C. §§ 2201, 2202.

2. Plaintiff has standing to maintain this action. Scanwell Laboratories Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970); Curran v.

Laird, 136 U.S.App.D.C. 280, 420 F.2d 122 (1969). Commonwealth of Pennsylvania, et al. v. Lynn et al., 362 F.Supp. 1363 (D.C.D.C.1973). The Plaintiff is aggrieved in the instant case in a manner presenting the kind of concrete adversary interest required to overcome the objections to standing raised by Defendants. Plaintiff has established "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult [and far reaching] questions". Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

3. The matter does not involve a political question or controversy. The case represents a question of whether an administrative agency has complied with a statutory requirement, and further, whether the agency may go forward with a proposed course of action notwithstanding express Congressional disapproval of the intended action. Plaintiff seeks to enjoin the Defendants from acting in a manner other than that consistent with laws already passed by the Congress and signed by the President (P.L. 92–585), and consistent with the sense of Congress that the proposed action fails to comport fully with the requirements of that law. Therefore this dispute is one which is readily within the judicial power. See e. g. Local 2677 AFGE v. Philips, 358 F.Supp. 60 (1973); Commonwealth of Pennsylvania v. Lynn, supra; Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). There is no textually demonstrable constitutional commitment of the issue to a coordinate political department; the Congress has clearly acted and the Executive proposes to go forward notwithstanding Congressional disapproval of its proposed action. Nor is there any problem with formulating "judicially discoverable and manageable standards for resolving [the dispute]." Likewise, the other criteria postulated by the Supreme Court in Baker v. Carr, supra, at p. 217, 82 S.Ct., at p. 710, for determining the presence of a political question cannot be resolved in Defendants' favor. The Court is not making any initial policy determination, nor is it undertaking to resolve independently the matter with lack of the respect due coordinate branches of government. Defendants' fears that there is the potentiality of embarrassment from multifarious pronouncements by various departments on the question are without foundation. Briefly, the Court must determine whether an executive official is following the explicit mandates of the Congress and the Constitution, which is the judicial function in our tripartite government. Cf. Marbury v. Madison, 5 U. S. (1 Cranch) 137, 2 L.Ed. 60 (1803); Local 2677 AFGE v. Philips, supra.

4. Plaintiff is entitled to a preliminary injunction, having met the criteria of Virginia Petroleum Jobbers Association v. Federal Power Commission, 104 U.S.App.D.C. 106, 110, 259 F.2d 921, 925 (1958). Plaintiff has made a showing of strong likelihood of success on the merits. The extensive legislative history of the PHS hospital system indicates quite clearly that Congress for many years treated the Public Health Service as special objects of its benefaction. Additionally the opinions of the Comptroller General of the United States of 1965 and 1971, and the action of the Congress in overwhelmingly adopting the July 10, 1973 report of the Conference Committee headed by Representative Staggers, which report explicitly rejected the Plan submitted by the Secretary on March 28, 1973, strongly suggest that if this case comes to trial on the merits, Plaintiff would prevail.

The Plan presented to Congress on March 28, 1973 was rejected by the Congress as made clear by the Report of the Committee of Conference dated July 10, 1973, see p. 29 (thereafter overwhelmingly adopted by the votes of each House of Congress) on the ground that "it did not meet the requirements of that law (P.L. 92–585) in that it did not present a plan assuring competent care

to PHS beneficiaries." p. 29, *supra.* Congress having indicated its disapproval of the Plan, as submitted by the Secretary on March 28, 1973, he may not effectuate the Plan either directly or indirectly unless and until he submits a new plan for closure or transfer of PHS facilities and Congress has acted favorably thereon or taken no action to indicate its disapproval thereof.

Moreover, the conclusions of the Congress and the materials furnished to this Court in this matter raise serious question whether the requirements of Section 3(b) of P.L. 92–585 regarding assurances that equivalent care and treatment will be continued have been met. There is a genuine question as whether defendants have not followed the procedures set forth in the Reorganization Act of 1949, as amended, 5 U.S.C.A. §§ 901–903. Both of these arguments advanced by plaintiffs raise substantial issues of law and support the conclusion that Plaintiff will prevail when this matter comes to trial.

With respect to irreparable injury, the Court is satisfied that the Plaintiff has made such a showing, while Defendants have failed to demonstrate any harm that the granting of the preliminary injunction would cause to them. Deprivation of essential medical care which seamen and other PHS beneficiaries have, for more than one hundred years, come to depend on, pursuant to a Plan which the Congress has found to be inadequate since it does not assure continuation of such care as required by statute, clearly would result in immediate and irreparable injury, for which Plaintiff and its members have no adequate remedy at law.

The equities also lie on the side of the Plaintiff. A mere recital of the Executive's performance in this instance, considering particularly the desire of Congress for a carefully studied and planned approach as manifested in the Committee Reports on P.L. 92–585, and the rather frightening intimation from counsel that the Secretary might proceed with the Plan even if the bill passed by Congress last week is vetoed, indicates to the Court that equity is on the side of the Plaintiff.

The public interest also compels granting the preliminary relief sought by Plaintiff. Preservation of a health facility of the United States upon which Plaintiff Union's members and other beneficiaries have become accustomed to rely for medical care since the early days of the Republic and which plays a vital role in the over-all Federal health-care program is manifestly in the public interest. The most recent legislation by Congress, passed only last week, demonstrates that Congress still intends to protect the long-established system which the Secretary proposes to dismantle. Action by the Secretary to carry out his Plan, in the face of such action by Congress, is plainly beyond his discretionary authority and would be in contravention of the public interest. Accordingly the Court will issue a preliminary injunction enjoining and restraining the Defendants from going forward with the Plan or otherwise limiting or diminishing in any way the medical care and treatment as presently afforded at PHS hospitals to PHS beneficiaries.

5. It appearing from the record before the Court on this motion that the actions of PHS in advance of the expiration of the 90-day waiting period set forth in P.L. 92–585, Section 3(a), may have had an adverse effect upon the maintenance and operation of the affected PHS hospitals, including a substantial impact on the ability of the PHS hospitals to retain their present staffs or attract new personnel, the Court concludes that it would be appropriate to require Defendants to send copies of the preliminary injunction together with these Findings of Fact and Conclusions of Law to all Directors of the PHS hospitals affected hereby, with instructions to post copies thereof in a conspicuous location so they might be read by all interested persons.