**SIOUX VALLEY EMPIRE ELECTRIC ASSOCIATION, INC., Plaintiff,**

**v.**

**Earl L. BUTZ, Secretary of the Department of Agriculture, and David A. Hamil, Administrator of Rural Electrification Administration, Defendants.**

**Civ. No. 73–4020.**

United States District Court,
D. South Dakota, S. D.

Nov. 29, 1973.

Alan F. Glover, Brookings, S. D., for plaintiff.

Robert D. Hiaring, Asst. U. S. Atty., Sioux Falls, S. D., and J. Michael Cogbill, Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM DECISION

NICHOL, Chief Judge.

This suit challenges the legality of an action of the Secretary of Agriculture in terminating a low interest rural electric loan program.

The plaintiff, Sioux Valley Empire Electric Association (Sioux Valley) is a rural electric cooperative chartered and existing under the laws of the State of South Dakota and located at Colman, South Dakota. On November 26, 1972, Sioux Valley submitted an application for a two per cent interest loan in the amount of $599,000.00, pursuant to provisions of the Rural Electrification Act of 1936, 7 U.S.C. § 901 et seq. (1936), amended by P.L. 93–32, 87 Stat. 65 (1973) (R.E. Act). While the loan was being processed and after it had been recommended for approval, the Department of Agriculture, by means of a press release, announced that the Rural Electric Administration would no longer make two per cent loans under the provisions of the R.E. Act and that any future government loans to qualified borrowers would be made under and pursuant to the provisions of the Rural Development Act of 1972, 7 U.S.C. § 1921 et seq. (1972) (R.D. Act), which authorized the Secretary to make or insure loans "to provide for essential community facilities," among other purposes, at interest rates not to exceed five per cent. The reasons propounded for the termination were to hold the 1973 federal budget outlays to $250 billion and to keep the outstanding public debt within the statutory limit through June of 1973. The announcement was promulgated on December 29, 1972. Since that date, the Department has refused to process Sioux Valley's loan application.

On May 11, 1973, five and one-half months after the Department's action, Congress enacted and the President signed into law a Bill to amend the R. E. Act (P.L. 93–32). The act establishes authority within the Rural Electrification Administration to make loans to qualified borrowers at the standard interest rate of five per cent, and also at the special interest rate of two per cent —if the borrower meets certain criteria. The Administrator was also given authority to guarantee loans and, at the request of the borrower, to convert the R.D. Act loan to an R.E. Act loan under this new law.

Plaintiff seeks a judgment declaring the actions of the Secretary arbitrary and unlawful and compelling the Secretary to reinstate the program and to consider, act upon, and approve Sioux Valley's loan application.

■ Plaintiff has also attempted to assert a claim on behalf of Basin Electric Power Cooperative on the ground that the R.E.A. had already agreed to loan the funds to Basin. Assuming the validity of Basin's claim, it is generally held that a member, such as the plaintiff, does not have standing to assert rights of the Cooperative, such as Basin. R. E. A. v. Central Louisiana Electric Company, Inc., 354 F.2d 859 (5th Cir. 1966), cert. denied, 385 U.S. 815, 87 S. Ct. 34, 17 L.Ed.2d 54.

The parties' cross-motions for summary judgment present two legal issues: (1) whether the Secretary of Agriculture was acting within the limits of his Congressionally-delegated authority when he terminated the two per cent direct loan program initiated by the R.E. Act, and rechanneled those appropriated program funds into the five per cent guaranteed and insured loan program initiated by the R.D. Act; and, (2) whether the President, acting through the Secretary of Agriculture, has the inherent power to rechannel those funds in order to promote sound fiscal management and policy. For the reasons hereinafter indicated, I resolve both issues in the negative.

## SUBJECT MATTER JURIS-
## DICTION

As will be pointed out, all three jurisdictional questions depend upon a resolution of that first issue. They depend upon a delineation of the limits of the

discretion conferred by Congress upon the Secretary.

Plaintiff bases subject matter jurisdiction upon 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1361 (statute authorizing mandamus against federal officials), 5 U.S.C. §§ 702–706 (statute authorizing judicial review of administrative proceedings) and 28 U.S. C. §§ 2201–2202 (Declaratory Judgment Act). Defendants attack jurisdiction on three fronts. First, since a judgment in this suit would expend itself upon the public treasury and interfere with the public administration, it requires that the government consent to be sued—a consent which has not been given. Second, since the Secretary's duties were non-ministerial and discretionary, mandamus is not available to compel action in their regard. Third, since the Secretary's action was committed by law to his discretion, judicial review under the Administrative Procedure Act is not available.

### Sovereign Immunity

■■ If it is determined that Congress *did not* confer upon the Secretary the power to terminate the two per cent loan program, then the government's consent to be sued is not a jurisdictional prerequisite to federal question jurisdiction. Although it is true that a suit which will expend itself upon the public treasury is a suit against the sovereign and cannot be brought absent the government's consent, there are two exceptions to that preclusion: (1) where the suit is brought against officers of the government to enjoin actions beyond their statutory power; and, (2) where suit is brought against officers of government to enjoin actions which have been exercised pursuant to powers which are themselves constitutionally void, or are void because of the manner in which they are exercised. Malone v. Bowdoin, 369 U.S. 643, 647, 82 S.Ct. 980, 8 L.Ed. 2d 168 (1962). Thus, if Congress did not intend to confer power upon the Secretary to terminate the two per cent loan program in order to effect sound fiscal policy, then the actions of the Secretary in terminating the loans were beyond his statutory power and the doctrine of sovereign immunity places no bar to the suit.

### Mandamus

■ If it is determined that the power was not conferred upon the Secretary, then the statute authorizing mandamus likewise confers jurisdiction. The power of the district courts to compel official action by relief in the nature of mandamus is limited to the enforcement of non-discretionary, ministerial duties. United States ex rel. Girard Trust Co. v. Helvering, 301 U.S. 540, 543, 57 S.Ct. 855, 81 L.Ed. 1272 (1937). Thus if Congress did not intend to confer upon the Secretary the power to terminate the two per cent loans, the duty to consider applications according to the criteria set forth in the statute is non-discretionary and mandamus lies.

### Administrative Procedure Act

If it is determined that the power was not conferred upon the Secretary, then the district court has jurisdiction pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 et seq. (1966). Section 701(a) provides that the A.P.A. does not apply to allow judicial review of agency action where (1) statutes preclude judicial review; or, (2) agency action is committed to agency discretion by law. But if Congress did not intend to confer upon the Secretary the discretion to terminate two per cent loans, then the action obviously is not committed to agency discretion by law, and there is no bar to judicial review.

The jurisdictional issues thus depend upon one of the issues embraced within the merits—the issue of legislative intent. Before embarking upon an analysis of that Congressional intent, the justiciability of those two questions must be confronted.

### JUSTICIABILITY

■ The Government contends that both questions presented to this Court for decision are political questions and

.therefore nonjusticiable. The political question doctrine is a function of separation of powers. Its purpose is to prevent the judiciary from exercising powers entrusted to another branch of government and from adjudicating matters which should be left to the body politic. There are, indeed, certain questions to which the judiciary should not attempt answer. Questions of statutory and constitutional interpretation, however, are not among them.

### Question of delegated authority

██ First, it is clear that the question of whether Congress has delegated to the Secretary the authority to terminate two per cent loans is not a political question. As was stated by Judge Leventhal in National Automatic Laundry and Cleaning Council v. Shultz, 143 U.S. App.D.C. 274, 443 F.2d 689, 695 (1971): "In our overall pattern of government the judicial branch has the function of requiring the executive (or administrative) branch to stay within the limits prescribed by the legislative branch." The same result was reached in the cases of State Highway Commission of Missouri v. Volpe, 479 F.2d 1099 (8th Cir. 1973) and Local 2677, American Federation of Government Employees v. Phillips, 358 F.Supp. 60 (D.D.C.1973).

### Question of Inherent Executive Power

██ Neither is the question of whether the President, acting through the Secretary of Agriculture, has the inherent Constitutional power to terminate that program (to impound funds) a political question.

██ The Constitution, ordained by the people, is the source of government power. The judiciary is charged with interpreting that Constitution. It is therefore its function to ascertain the residence of Constitutional power. The defendants argue that the power to control spending is a shared power between the Executive and Congress and that it is clearly not a matter for the judiciary. The defendants argue that the courts have neither the power nor the competence to control spending policy. Both propositions may be correct, but they do not address the issue. There is no question that the judiciary has no power to review spending decisions of that branch of government having the power to control spending policy. But the judiciary does have the power, indeed it is the basic function of the judiciary, to interpret the Constitution in an effort to determine where the power to spend resides.

This is the clear import of all the political question cases. In Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the question was whether the malapportionment among legislative districts in Tennessee violated the Equal Protection clause of the Constitution. The Court held that the courts have the power to interpret the Constitution and to measure the actions of states and other government branches against it. In Luther v. Borden, 7 How. 1, 12 L.Ed. 581 (1803), the question involved which state government is the lawful state government of Rhode Island. It was held that, although the courts cannot determine which state government is the lawful one, courts can decide which branch, under the Constitution, is empowered to make that decision. In the case of Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), the question involved whether Congress was empowered to exclude its members. Again, the Court upheld its own power to determine the residence of power—to determine whether Congress had or had not the power to exclude its members.

The Government cites the case of San Francisco v. United States Department of Housing and Urban Development et al., 340 F.Supp. 654 (N.D.Cal.1972), for the opposite conclusion. That court was not addressing itself to the justiciability of the question of inherent Presidential power. Having held that Congress had delegated to the Administrator the discretion to withhold funds, the court simply held nonjusticiable the question of whether the Secretary had abused that discretion.

## LEGISLATIVE INTENT

Before launching an analysis of Congressional intent, the precise issue must be clarified. It is the Government's position that we are looking for a manifestation of Congressional intent to compel the expenditure of all funds appropriated. If that manifestation is not found, so contends the Government, the Secretary may terminate the program in order to promote sound fiscal policy. Plaintiff's statement of the issue is more appropriate:

> Plaintiff does not believe that the issue here is whether Congress has evidenced a mandatory intention that all funds appropriated for the R.E.A. two per cent loan program be spent for that purpose. As has been noted, the Department's intention is not simply to effect a partial reduction in the volume of loans under the R.E. Act, or to delay the obligation of appropriated funds to a later date; it is to terminate the program of two per cent loans and to substitute a program of higher cost loans. Accordingly, the appropriate inquiry is whether Congress has evidenced a "mandatory" intention that the Act program continue to exist and be administered or rather has conferred discretion upon the Executive unilaterally to terminate or refuse to implement the program in its entirety.

There is no question that the Secretary has been delegated the discretion to refuse to make two per cent R.E.A. loans. The question is, how is that discretion circumscribed? What are the limits of that discretion? Specifically, did Congress intend to delegate to the Secretary the discretion to terminate the two per cent direct loan program for the purpose of curtailing governmental expenditure and therefore promoting sound fiscal policy?

In the News Release from the Department of Agriculture announcing the effective termination of the two per cent loan program, it is stated: "This action was made possible by the enactment of the Rural Development Act of 1972 in which Congress provided very broad authorities to make guaranteed and insured loans to finance all types of community development programs." Thus, to answer the question relating to Congressional intent, we must look both to the R.E. Act and the R.D. Act.

### R.D. Act

There is certainly no basis in the R.D. Act or its legislative history for the conclusion that Congress intended that the R.D. Act could be administered in such a way as to supplant existing programs or that, through the Act, discretion was delegated to the Department to terminate the R.E. loan program. Section 104 of the R.D. Act authorizes the Secretary of Agriculture to make or insure loans to, among others, "associations, including corporations not operated for profit," for, among other purposes, the "installation or improvement" of "essential community facilities." There is no express reference in the legislative history of the R.D. Act to the R.E. Act or to the Rural Electrification Administration. Nor are there any express indications that electric generation, transmission or distribution facilities were intended to be included within the definition of "essential community facilities." Indeed, every indication is that Congress intended to supplement, rather than supplant, the R.E. Act of 1936.[1]

1. Senator Talmadge, Chairman of the Senate Committee on Agriculture and Forestry, and a principal spokesman for the legislation, stated: "The bill consists of six titles. Each fills a major gap in existing legislation for rural America.

. . . (The Bill was) designed to complement and work harmoniously with whatever . . . economic development programs may be put into effect and operation at any particular time. . . .

. . . We seek here not to duplicate or supercede these other programs but to supplement and strengthen them. 118 Cong. Rec. S13929-30 (daily ed. Aug. 17, 1972). Chairman Poage of the House Agriculture Committee stated: "(T)his bill does not displace any agency or take over the work of

*R.E. Act*

It is also clear that the R.E. Act itself confers no discretion upon the Secretary to terminate the program.

The Rural Electrification Act of 1936, as amended, provides in pertinent part:

(1) 7 U.S.C. § 902 provides in part:

The Administrator is authorized and empowered to make loans in the several States and Territories of the United States for rural electrification . . . ;

(2) 7 U.S.C. § 903 provides in part:

There are authorized to be appropriated such sums as the Congress may from time to time determine to be necessary for the purposes of this chapter as hereinafter provided.

(c) Twenty-five per centum of the annual sums herein made available or appropriated for loans for rural electrification pursuant to sections 904 and 905 of this title shall be allotted yearly by the Administrator for loans in the several States in the proportion which the number of their farms not then receiving central station electric service bears to the total number of farms of the United States not then receiving such service: Provided, That if any part of such sums are not loaned or obligated during the first six months of the fiscal year for which they are made available, such part shall thereafter be available for loans by the Administrator without allotment: Provided, however, That not more than 25 per centum of said sum may be employed in any one State or in all of the Territories. The Administrator shall within ninety days after the beginning of each fiscal year determine for each State and for the United States the number of farms not then receiving such service.

(d) The remaining 75 per centum of such annual sums shall be available for rural electrification loans in the several States and in the Territories, without allotment as hereinabove provided in such amounts for each State and Territory as, in the opinion of the Administrator may be effectively employed for the purposes of this chapter, and to carry out the provisions of section 907 of this title: Provided, however, That not more than 25 per centum of said unalloted annual sums may be employed in any one State, or in all of the Territories.

(e) If any part of the annual sums made available for the purposes of this chapter are not loaned or obligated during the fiscal year for which they are made available, such unexpended or unobligated sums shall be available for loans by the Administrator in the following year or years without allotment: Provided, however, That not more than 25 per centum of said sums for rural electrification loans may be employed in any one State or in all of the Territories.

(3) 7 U.S.C. § 904 provides in part:

The Administrator is authorized and empowered, from the sums hereinbefore authorized, to make loans for rural electrification to . . . cooperative, nonprofit, or limited-dividend associations, . . . for the purpose of financing the construction and operation of generating plants, electric transmission and distribution lines or systems for the furnishing of electric energy to persons in rural areas who are not receiving central station service,

---

any existing agency. We are simply trying to let these existing agencies render needed service in areas where no other agencies now exist to fulfill the need." 118 Cong. Rec. H133 (daily ed. Feb. 23, 1972).

. . . Provided, . . . [s]uch loans shall be on such terms and conditions relating to the expenditure of the moneys loaned and the security therefor as the Administrator shall determine and may be made payable in whole or in part out of the income: Provided, further, That all such loans shall be self-liquidating within a period of not to exceed thirty-five years, and shall bear interest at the rate of 2 per centum per annum; . . .. Loans under this section and section 905 of this title shall not be made unless the Administrator finds and certifies that in his judgment the security therefor is reasonably adequate and such loan will be repaid within the time agreed.

██ It is the contention of the Government that the mandatory language in 7 U.S.C. § 903(c), (d), and (e) is merely language of prohibition, prohibiting the Secretary, for the first six months of the year only, and as to only 25 per cent of the appropriation, from making loans to borrowers in any state except in proportion to the state's unelectrified farms. It is curious that Congress did not use words of prohibition if, as contended by the Government, Congress intended them. I agree with the interpretation accorded this language by the plaintiff. Where Congress provides that 25 per cent of the appropriation "shall be made available" during the first six months to states in proportion to their percentage of unelectrified farms, that the remaining 75 per cent "shall be available" to qualified applicants regardless of that proportion, and that any part of the annual appropriation which is not loaned during the year "shall be available" in the following years without allotment, Congress meant what it said. Those monies *shall be available* to qualified applicants. The Secretary has the nondiscretionary duty to make the loans to qualified applicants. If the qualified applicants do not exhaust the appropriation, then it carries over, unalloted, into the following year.

██ This conclusion is well-supported. In the case of State Highway Commission of Missouri v. Volpe, *supra,* Judge Lay engaged in an extended analysis, incorporating an examination of comparable legislation and its legislative history, of the phrase "shall be available for expenditure." Judge Lay concluded: "The phrase 'shall be available for expenditure' is indicative of a Congressional intent that the money so apportioned may be fully obligated by the states." 479 F.2d at 1110, 1111 n. 15. Thus, where a statute provides that a certain amount of money "shall be available" to states or to certain parties, the money must be spent to the extent of the qualified applicants. The Administrator's discretion is limited to the determination of qualifications.

██ The Government points to the language contained in 7 U.S.C. § 904, which provides that the Administrator is "authorized and empowered" to make the loans in question. But, in ascertaining legislative intent, the entire statute, as well as its purpose must be considered. Then Assistant Attorney General William H. Rehnquist, now Associate Justice of the United States Supreme Court, commenting upon the method of determining legislative intent, stated:

On the question of trying to find a mandatory intent on the part of Congress, it is not a question of looking for the word "shall" as opposed to "may." Our office, in the memo that was published in the Congressional Record in December, 1969, concluded that in providing for certain formula grants to schools . . . Congress had indicated that these were to be spent, not necessarily because it said they shall be spent, but just from taking the overall language of the authorization bill, the enabling statute, if there was one (and) the particular appropriation language, and construing them together to try to find on a reasonable basis what intent Congress

manifested. Memorandum Re Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools (Dec. 1, 1969), reprinted in hearings on Executive Impoundment of Appropriated Funds Before the Subcommittee on Separation of Powers of the Senate Judiciary Committee, 92nd Cong. 1st Sess., at 234 (1971).

I think it an accurate interpretation that the permissive language of 7 U.S.C. § 904 is superceded by the mandatory language of 7 U.S.C. 903(c), (d), and (e). I do not think it reasonable to assume that Congress intended to give the Secretary complete discretion in the making of loans under the program.

This interpretation is well-supported. In the case of Berends v. Butz, 357 F. Supp. 143 (D.Minn.1973), Judge Lord dealt with 7 U.S.C. § 1961, which provided federal aid for areas hit with natural emergencies. The statute provides:

"The Secretary may designate any area in the United States . . . as an emergency area if he finds . . . ."

Judge Lord held:

"As to this part of the statute, it is clear that the decision whether or not to designate an area an 'emergency loan area' is committed to the discretion of the Secretary. However, the Secretary has exercised his discretion in this regard; he has designated this fifteen county area as an 'emergency loan area.' 7 U.S.C. § 1961(b) 'authorizes' the Secretary to make loans in such a designated area. The chief benefit flowing from a Secretarial designation is the availability of emergency loans. It is clear from the legislative history that Congress intended that emergency loans would be available in those areas designated as emergency loan areas." at 150.

Thus, although the statute was couched in permissive terms, the Court held that the Administrator's discretion extended only to a determination as to whether a particular area met the criteria as an emergency loan area. The permissive language did not confer absolute discretion on the Secretary to refuse to make loans. In Commonwealth of Pennsylvania v. Lynn, 362 F.Supp. 1363 (D.D.C. 1973), the Court dealt with three statutes, all containing permissive language ( . . . secretary is authorized to . . . ): 12 U.S.C. 1715z, 12 U.S.C. 1715z-1, 12 U.S.C. § 1701s (1965), amended by 12 U.S.C. § 1701s (1970). Despite the permissive nature of the language, despite the fact that the programs were only temporarily suspended due to difficulties in administering the program according to the legislative intent, Judge Richey held that the statutory language and legislative history demonstrate a Congressional mandate that the money be allocated to qualified applicants.

The Government directs the Court's attention to P.L. 93–32, which was enacted on May 11, 1973, and which amended the R.E. Act of 1936, and points to that amendment as a "ratification" of the Secretary's action and therefore a reinforcement of Congressional intent to allow the Secretary to refuse to make the two per cent loans. P.L. 93–32 provides in part:

Sec. 305. Insured Loans; Interest Rates and Lending Levels.—

(a) The Administrator is authorized to make insured loans under this title and at the interest rates hereinafter provided to the full extent of the assets available in the fund, subject only to limitations as to amounts authorized for loans and advances as may be from time to time imposed by the Congress of the United States for loans to be made in any one year, which amounts shall remain available until expended . . . .

(b) Insured Loans made under this title shall bear interest at either 2 per centum per annum (hereinafter called the 'special rate'), or 5 per centum per annum (hereinafter called the 'standard rate'). Loans bearing the special rate shall be available only for an electric or telephone borrower which

meets either of the following conditions: (here follow the criteria).

While it might be admitted that the amendment constituted a subsequent and partial approval of the *policy* behind the Secretary's action, it cannot be denied that this subsequent approval does not indicate approval or ratification of the Administrator's *action* itself nor does it validate the Administrator's action if indeed it was beyond his authority. In this regard, the case of Local 2677, American Federation of Government Employees v. Phillips, 358 F.Supp. 60 (D.D.C.1973), presents a factual situation which is somewhat similar. The President had announced, in his annual budget message, that he was not requesting any funds for the Community Action Agency of the Office of Economic Opportunity for fiscal 1973. He thereupon ordered the Administrator to utilize all previously appropriated funds to phase out the activities of the Community Action Programs. The Court held that, even though Congress might eventually act on the President's proposal and cut off C.A.A. funding, as long as they had not yet acted, the Administrator could not anticipate that action. The Court ordered the Administrator to utilize all appropriated funds in furtherance of the purpose of the C.A.A. until such time as Congress determined such funds to be unnecessary.

The Government points to the repeated failure of Congress, in the face of Presidential impoundment, to assert its mandatory intent by amending the Act as indicative of an intent to confer the discretion upon the Secretary. In the first place, one walks on dangerously thin ice when trying to glean an affirmative intent from a Congressional failure to act. Even in the face of a Congressional failure to change the words of the statute from "authorized and empowered" to "authorized and directed," it is a slim argument which equates that failure with a manifestation of Congressional intent to delegate to the Administrator the power to terminate a Congressional program. Secondly, Congress did reassert its mandatory intent in P.L. 93–32. After reciting all the beneficial purposes served by this legislation and emphasizing the need for the legislation, Congress confronted the prospect of Presidential impoundment:

Sec. 305. Insured Loans; Interest Rates and Lending Levels.—

(a) The Administrator is authorized to make insured loans under this title and at the interest rates hereinafter provided *to the full extent of the assets available in the fund, subject only to limitations as to amounts authorized for loans and advances as may be from time to time imposed by the Congress of the United States for loans to be made in any one year, which amounts shall remain available until expended . . . .* (emphasis added).

Thus, although Congress subsequently concurred in the *policy* of curtailing (but not terminating) the two per cent loan program, Congress subsequently condemned the Administrator's *actions* in forging that policy by expressly commanding that he not do so in the future.

■ It may be true, as argued by the Government, that the statute in question does not command the expenditure of all the funds appropriated. But this court cannot accept the proposition that Congress intended to confer upon the Secretary the power to terminate a Congressional program and rechannel the appropriated funds through a separate and distinct Congressional program. It is true that the Executive is entrusted with the responsibility of effecting savings in administering Congressional programs. The Anti-deficiency Act, 31 U. S.C. § 665(c) confers and acknowledges this responsibility. But this must not be accomplished at the expense of the program. The President can trim the fat, but he must not disturb the meat. It is true that the President may reorganize executive departments in an effort to streamline administration. 5 U. S.C. §§ 901–913. But he must undertake that reorganization in compliance with

the procedures ordained by Congress. 5 U.S.C. § 906(a). This undertaking he did not attempt.

Congress has conferred a great deal of power upon the President to enable him to confront the problems of an increasingly complex economy. But, in this Court's view, Congress has not yet gone so far, at least with respect to the legislation with which we presently deal, to confer upon the President the power to reassess and reorder Congressional priorities in an attempt to effect Executive economic policies.

## INHERENT EXECUTIVE POWER

■ The Government alternatively contends that the authority of the President to impound funds is grounded upon Article II of the Constitution. Section 1 of that Article provides that "the executive Power shall be vested in a President of the United States of America," and Section 3 requires that the President "shall take Care that the Laws be faithfully executed."

■ I can find nothing in the case law supportive of the Government's position. Indeed, the case law points to the opposite conclusion. The leading case dealing with the constitutional division of power between the President and Congress is Youngstown Sheet and Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), the Steel Seizure case. In 1952, after several months of negotiation and mediation, the United Steelworkers called a nationwide strike against most of the country's steel mills. President Truman, believing that the strike would immediately curtail the Korean War effort and jeopardize the nation's steel mills, ordered his Secretary of Commerce to seize possession of the nation's steel mills and to operate them on behalf of the United States. The Secretary did so by calling upon the managers of the seized companies to continue to operate them as agents of the United States. The companies obeyed the order but challenged the action by seeking injunctive relief in the federal courts. Addressing himself to the claim of power under Article II, Justice Black stated:

> Nor can the seizure order be sustained because of the several constitutional provisions that grant executive power to the President. In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker. The Constitution limits his functions in the law making process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad. And the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute. . . .

> The Founders of this Nation entrusted the law making power to Congress alone in both good and bad times. at 587–589, 72 S.Ct. at 867.

The same position was vigorously taken in the earlier case of Kendall v. United States ex rel. Stokes, 37 U.S. 524, 9 L. Ed. 1181 (1938). The Supreme Court was asked to hold that it was within the constitutional authority of the Postmaster General, as an official of the Executive Branch, to refuse to pay a contractor for services rendered, notwithstanding that Congress, by private legislation, had specifically directed payment to the contractor. In refusing to so hold, this early decision firmly established that the President's power, if any, to spend or not to spend appropriated funds derives from legislatively delegated powers and is not inherent in Article II of the Constitution itself. This proposition was forcefully reiterated, in a memorandum relating to the impoundment of funds for federally impacted schools by then Assistant Attorney General William H. Rehnquist:

> It is in our view extremely difficult to formulate a constitutional theory to justify a refusal by the President to comply with a Congressional directive to spend. It may be argued that the spending of money is inherently an executive function, but the execution of any law, is by definition an execu-

tive function and it seems an anomalous proposition that because the Executive branch is bound to execute the laws, it is free to decline to execute them. Memorandum Re Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools (Dec. 1, 1969), reprinted in Hearings on Executive Impoundment of Appropriated Funds Before the Subcommittee on Separation of Powers of the Senate Judiciary Committee, 92nd Cong., 1st Sess. at 283 (1971).

■ It may be true that Article II embraces a broad grant of executive power, as is contended by the Government. In the related areas of national defense and international relations, that power has been pushed to its hilt since the advent of the nuclear missile age. New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). But that broad grant cannot be said to include the power to nullify Congressional action. Pennsylvania v. Lynn, *supra*, 362 F.Supp. at 1372. It may be true, as contended by the Government, that Congress, as presently organized, is incapable of achieving sound fiscal planning—that necessity demands that the President fill the void. Necessity might be the mother of invention, but it does not give birth to constitutional power. The dangers of following the dictates of "necessity" and permitting one branch to encroach upon the powers of another in the name of efficiency are vividly expressed by Justice Brandeis, dissenting in Myers v. United States, 272 U.S. 52, 293, 47 S.Ct. 21, 85, 71 L.Ed. 160 (1926):

> The doctrine of the separation of powers was adopted by the convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was, not to avoid friction, but, by means of the inevitable friction incident to the distribution of the government powers among three departments, to save the people from autocracy.

The power sought to be exercised in the impoundment cases is more all-encompassing than that sought to be exercised in the *Steel Seizure* case. Indeed, it is by far the most dangerous abdication of legislative power in an age of Congressional acquiescence, for it vests in the executive the very essence of legislative power. If it is conceded that the President has the power to impound Congressionally-appropriated funds to promote sound fiscal policy, who is to determine whether the impoundment was purposed upon the achievement of sound fiscal policy or upon Presidential disapproval of the Congressional program for which the funds were appropriated? Where impoundment of funds is selective among the various programs, who is to determine the propriety of the President's arrangement of priorities? These questions are unanswerable. Should the power be conceded to the President, the very nucleus of Congressional power would pass to the Executive sphere. The system of checks and balances would be emasculated.

The Constitution rests with Congress the power to declare policy and to appropriate money to carry out that policy. The President is given the power to spend those appropriated funds. Admittedly, with the increasing complexity of maintaining a strong and healthy economy has come a Congressional recognition of the need for efficient, central economic planning. With that recognition has come a gradual Congressional abdication of control over fiscal policy. But this Congressional abdication cannot be said to vest in the Executive the power to nullify the mandates of Congress.

Plaintiff's motion for summary judgment is granted.