**Joseph BENNETT et al.,
Plaintiffs,**

**v.**

**Earl L. BUTZ et al., Defendants.**

**No. 4–73 Civ. 284.**

United States District Court,
D. Minnesota,
Fourth Division.

Oct. 11, 1974.

Marino, Becker & Granquist by Luther Granquist, Legal Aid Society, Inc., Minneapolis, Minn., Ronald F. Pollack and Roger A. Schwartz, New York City, for plaintiffs.

Robert G. Renner by Thorwald H. Anderson, Jr., Asst. U. S. Atty., Minneapolis, Minn., for defendants.

## MEMORANDUM AND ORDER

MILES W. LORD, District Judge.

By authority of the Food Stamp Act of 1964, 7 U.S.C. § 2011 et seq., the United States Department of Agriculture (U.S.D.A.) through state agencies,

has established the Food Stamp Program whereby low income families may purchase food coupons with a face value higher than the purchase price. These coupons may then be used at their face value to buy food at approved stores. The difference between the discount price paid for the coupons and their face value varies depending upon the income of the eligible families. Federal funds make up the difference between the coupon purchase price and their face value and also pay for some of the administrative costs of the program. The two-fold purpose of the program is to increase the food purchasing power of low-income families so that they have an opportunity to obtain a nutritionally adequate diet and to strengthen the agricultural economy. 7 U.S.C. § 2011.

For fiscal year 1973, the Congress appropriated a total of $2.5 billion for the Food Stamp Program. In November or December 1972, the Secretary of Agriculture, in his 1974 budget submission, predicted that an unobligated balance of $302 million would remain in the Food Stamp Program at the end of fiscal year 1973. Subsequently, it has been established that the actual budget surplus for fiscal year 1973 was $278 million. In this action, the plaintiffs contend that this surplus arose because the Secretary of Agriculture did not administer the program in accordance with Congressional directives. They ask this Court to order the Secretary of Agriculture to submit to the Court a plan for expenditure of this money in a manner consistent with the Food Stamp Act.

On June 25, 1973, prior to the expiration of fiscal year 1973, this Court issued a preliminary injunction to prevent the disputed surplus from reverting into the general treasury fund. Subsequently, a hearing was held on cross motions for summary judgment and on defendants' motions to dismiss. Plaintiffs submitted substantial documentary and statistical evidence, none of which has been disputed factually by the defendants. Upon review of the evidence and briefs submitted by the parties, the Court finds that there are no material facts in dispute and that the plaintiffs are entitled to summary judgment on certain of their claims. The plaintiffs are two individual food stamp recipients and two welfare recipient groups —the Northwoods Welfare Committee of Anoka County and the National Welfare Rights Organization.[1] Defendants are the United States Secretary of Agriculture, the Administrator of the Food and Nutrition Service of U.S.D.A. and the Director of the Food Stamp Division of the Food and Nutrition Service (F.N.S.). These officials have the responsibility for administration of the Food Stamp Act.

The plaintiffs claim that the Secretary and his subordinates failed in three respects to implement the statutory requirements of the Food Stamp Act during fiscal year 1973. First, they claim that the Secretary failed to implement the outreach requirements of the Food Stamp Act set forth in 7 U.S.C. § 2019(e)(5). This section mandates the Secretary to require, of each state participating in the Food Stamp Program, a plan for effective action to inform low-income persons of the benefits available under the program and "to insure the participation of eligible households." The plaintiffs claim that the Secretary failed to do this and refused to take remedial action after the states failed to

1. Plaintiffs seek to maintain their suit as a class action, wherein the named individual plaintiffs would represent a class of all actual or potential food stamp recipients in the United States. They allege that since declaratory and injunctive relief for the class as a whole is possible, and since the defendants have acted or refused to act on grounds generally applicable to the class, the action should be maintained as a class action

pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure. The Court, however, does not adopt this view. The relief requested by the plaintiffs, if granted, will be identical regardless of whether or not a class action is maintained. Because no useful purpose for proceeding as a class appears, the motion will be denied. *See* Wilcox v. Commerce Bank of Kansas City, 474 F.2d 336 (10th Cir. 1973).

formulate and implement appropriate outreach plans. Secondly, plaintiffs claim that the adoption by the Secretary of the Economy Food Plan as a basis for setting coupon allowance standards is inconsistent with those provisions of the Act requiring that recipients be provided with "an opportunity to obtain a nutritionally adequate diet." 7 U.S.C. §§ 2013(a), 2014(a) and 2016(a). Finally, they claim that the failure of the Secretary to revise the food stamp coupon allowance during fiscal year 1973 in light of sharp increases in food costs at that time was also inconsistent with the Act. For the reasons which are discussed in detail below, the Court concludes that the plaintiffs are entitled to relief on their first claim only.

I

In addition to their summary judgment motion, defendants have moved for dismissal on the grounds that this Court lacks jurisdiction to hear this dispute. Consequently, this motion must be considered before discussing the merits of the case. As was indicated in the findings of fact, conclusions of law and order granting the preliminary injunction, jurisdiction in this case may be founded upon 28 U.S.C. § 1337 (1970) because it is one which arises out of an Act of Congress regulating commerce. *See* Moreno v. United States Department of Agriculture, 345 F.Supp. 310, 313 (D.D.C.1972), affd. 413 U.S. 528, 93 S. Ct. 2821, 37 L.Ed.2d 782 (1973); Lidie v. State of California, 478 F.2d 552, 554 (9th Cir. 1973). In addition, the Court also finds that jurisdiction in this matter exists under 28 U.S.C. § 1361 (1970) which provides that the District Courts "shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

Defendants are clearly officers or employees of the United States within the meaning of the Act and plaintiffs contend that they are owed the duty of

spending the surplus on the food stamp program. This contention is not frivolous or insubstantial. Thus, plaintiffs have alleged the prerequisites for jurisdiction under this section and it is appropriate for the Court to exercise its jurisdiction to determine the scope of the defendants' discretion and whether defendants' conduct was an abuse of this discretion. *See e. g.,* National Ass'n of Government Workers v. White, 135 U.S. App.D.C. 290, 418 F.2d 1126, 1129 (1969); Bailey v. Romney, 359 F.Supp. 596, 599 (D.D.C.1972). Whether the conduct sought is susceptible to relief under the strict standards for the issuance of a writ in the nature of mandamus is not a jurisdictional issue but one which must be resolved on consideration of the merits of the case.

As another grounds to bar a hearing on the merits of the controversy, defendants contend that this is an unconsented suit against the government which calls for expenditures on the public treasury. For this reason, it is argued, the action is not maintainable under the doctrine of sovereign immunity. This case, however, falls within one of the well recognized exceptions to the sovereign immunity doctrine. According to Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), the doctrine does not apply to "action by officers beyond their statutory powers." *Id.* at 621, 83 S.Ct. at 1007. *See also,* Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 689–690, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); State Highway Commission of Missouri v. Volpe, 479 F.2d 1099, 1123 (8th Cir. 1973). Moreover, the relief sought in this matter does not call for the unauthorized expenditure of sovereign funds. On the contrary, it merely seeks to have the defendants comply with what is alleged to be a Congressional directive to spend certain funds already authorized and appropriated.

II

The plaintiffs' claim with respect to the outreach requirements of the Act

must be viewed in the context of the development of the food stamp program. Originally, the program was established in 1961 as a pilot project operated under the discretionary authority of the Secretary of Agriculture. *See,* H.Rep.No. 1228, 88th Cong., 2d Sess. (1964), at 2. The Congress determined that the program worked and had the effect of expanding the agricultural economy by stimulating increased food sales and of improving the nutritional status of low-income households. *Id.* at 5, 8–12; S. Rep. No. 1124, 88th Cong., 2d Sess. (1964), at 1, 5–8. When the Act was adopted in 1964, it was recognized that the program could have been continued without further legislation, but that it was preferable for the program to be under the specific legislative direction and control of the Congress. H.Rep. No. 1228, 88th Cong., 2d Sess. (1964), at 2.

In the years that followed, the Congress became increasingly aware of the problems of hunger and malnutrition in this country. Some of these developments are summarized in Hunger and the Reform of Welfare: A Question of Nutritional Adequacy, Senate Select Committee on Nutrition and Human Needs staff report, 92d Cong., 2d Sess. (February, 1972). Statements were made on the Senate floor emphasizing the fact that the food stamp program was not meeting the needs of low-income persons and that token participation in the program was all too evident. 115 Cong.Rec. 26743 (September 23, 1969) (Senator Byrd of West Virginia); 115 Cong.Rec. 26847 (September 24, 1969) (Senator Mondale); 115 Cong.Rec. 26873 (September 24, 1969) (Senator Kennedy). This concern ultimately culminated in amendments to the Food Stamp Act adopted by the Congress in 1970 and approved by the President in January, 1971. *See,* Public Law 91–671, 84 Stat. 2048. The intent of Congress to expand the coverage and effectiveness of the food stamp program is clearly evidenced by the revised declaration of policy set forth in 7 U.S.C. § 2011, the

revisions in the standard for coupon allowances set forth in 7 U.S.C. §§ 2013(a) and 2016(a), the requirements for cost of living adjustments in coupon allowances added to 7 U.S.C. § 2016(a), and, of primary importance for this action, the addition of the "outreach requirement" to 7 U.S.C. § 2019(e)(5). That latter provision requires the various states participating in the program to submit to the Secretary of Agriculture for his approval a plan of operation which provides that the state agency which administers the food stamp program

> . . . shall undertake effective action, including the use of services provided by other federally funded agencies and organizations, to inform low-income households concerning the availability and benefits of the food stamp program and insure the participation of eligible households. 7 U.S. C. § 2019(e)(5).

Congressional concern for expansion of the food stamp program is also evident in increased appropriations. As part of the 1971 amendments, the Congress appropriated $1.75 billion for fiscal year 1971. 7 U.S.C. § 2025(a). For fiscal year 1972, Congress increased the appropriation to $2.2 billion. Public Law 92–73, 85 Stat. 200. For fiscal year 1973, the House funded the program at a $2.341 billion level. *See,* 118 Cong.Rec. H 6336–37 (daily ed., June 29, 1972). The Senate increased the amount to be appropriated for the program to $2.5 billion. 118 Cong.Rec. S 12059–060 (daily ed., July 27, 1972). The need for outreach was a principal basis for this increased appropriation. *Id.* In its final form, the appropriations statute provided that the additional sum appropriated by the Senate was to be available if needed. Public Law 92–399, 86 Stat. 610.

The evidence before this Court demonstrates that this amount was surely necessary to effectuate the purposes of the Act. The Court finds that the budget surplus at issue here would have been

spent if the defendants had complied with Congressional directives regarding outreach alone. For example, had there been only a 13% increase in food stamp participation during fiscal year 1973, an increase the Court considers minimal if effective action had been required throughout the fiscal year, the entire appropriation would have been spent and this lawsuit would never have been brought.

## III

█ The statutory outreach mandate reflects Congressional concern with token participation in the food stamp program. The statute uses strong language. Outreach efforts are to entail "effective action" not only to inform poor people of the program's benefits but also to "insure" their participation. 7 U.S.C. § 2019(e)(5). The record before this Court demonstrates that the defendant Secretary and his subordinates delayed implementation of the outreach effort at the federal level, issued regulations and directives which were inconsistent with the Act, approved plans which in no way approached the outreach standards set by the Congress, and required of the states no remedial action to correct inadequacies in the outreach program. The Secretary's response to the Congressional directive, when viewed in its totality, is fairly described as a total failure on his part to do what the Congress clearly intended him to do.

It was not until April 16, 1971, three months after the 1971 amendments were approved, that the Secretary issued proposed regulations to implement the Act. In the proposed regulations, references to outreach followed the statutory language, including the phrase "insure the participation of eligible households." *See,* 36 Fed.Reg. 7243, 7245 and 7248 (April 16, 1971). In the final regulations issued six months after the statute was approved, however, all references to *insuring* participation were eliminated. *See,* Fed.Reg. 14102 *et seq.* (July 29, 1971). The Secretary limited outreach

to "any communicative effort seeking the encouragement of program participation by eligible households." 7 C.F.R. § 270.2(mm). He allowed 180 days for the initial submission of state outreach plans. 7 C.F.R. § 271.1(s)(1)(iii). The result is that the Secretary required no more than the preparation and submission of proposed state outreach plans by late January, 1972, more than one year after the statutory outreach requirement was passed by the Congress and signed by the President. Furthermore, the more detailed F.N.S. Instruction on outreach plans, FNS (FS) Instruction 732–6—the document to be used by the states in preparing the required outreach plans—was not issued until December 29, 1971.

The Secretary permitted further delays in the eventual submission, approval and implementation of outreach plans. Only three states had approved and implemented outreach plans at the beginning of the fiscal year at issue here— one and a half years after the outreach mandate was incorporated into the Act. By the end of the first quarter of fiscal 1973, 25 of the 48 jurisdictions that were implementing the food stamp program had not yet implemented any outreach plans. By the end of calendar year 1972, two years after passage of the statutory outreach plans, only seven more states had implemented their outreach plans, leaving 18 states without the statutorily mandated plans. Even at the end of fiscal 1973, there were still nine states which had not yet implemented such a plan.

█ The Court recognizes that it is the primary responsibility of the various state agencies to develop and implement outreach plans. H.Rep. No. 91–1402, U.S.Code Cong. & Admin.News, 91st Cong. 2d Sess. at pp. 6026, 6040 (1970). As is developed below, virtually all of the plans appear to be and proved to be inadequate. However, the Secretary of Agriculture and his subordinates also bear considerable responsibility for the failure of the states to develop outreach plans and the failure of those plans to

provide effective outreach. The defendants have failed to do what the Act requires of them—to require the implementation of the statutory outreach requirements.

Section 10(f) of the Act, 7 U.S.C. § 2019(f), specifically provides that the Secretary shall inform the various state agencies of any failure substantially to comply with the Act and to require compliance. There is nothing in the record to show that the Secretary took any such forceful action even in those states most derelict in submission of plans. Rather, the record shows no more than occasional letters and telephone calls made to delinquent state agencies.

■ The Court is not in a position to determine the minimum time which the Secretary could allow for submission and approval of outreach plans. For the purposes of this action, however, it is sufficient to conclude that in view of the strong legislative mandate, effective outreach actions in the states were necessary at least by the beginning of fiscal year 1973—almost a year and a half after the outreach requirement became law. The record is clear that in most states, outreach efforts were not implemented by that time and that the Secretary took no effective steps to alter that situation. Congress intended outreach *action; see,* 7 U.S.C. §§ 2019(e)(5) and 2024(b), but inaction at both the state and the federal level was what actually took place.

■ The plaintiffs have also challenged the adequacy of the outreach plans which were approved by the Secretary. The Court has examined these outreach plans and agrees in general with the plaintiffs' contentions that most of them evidence a lack of analysis of the state's needs, a lack of thought in devising a plan to meet those needs, and a lack of commitment to utilize resources that would satisfy those needs. The question remains, however, as to the role of the Court in reviewing, in the context of this case, the action taken by the Secretary and his subordinates in approving those plans. It is the admin-

istrative body's responsibility in the first instance to take this action and to determine what plans meet the statutory standards. In this respect, however, it is necessary to emphasize again that the Food Stamp Act was passed to place under Congressional directive and control a program previously administered on a wholly discretionary basis by the Secretary. With respect to outreach efforts, the Congress mandated the Secretary to require of the various state agencies "effective action" to "insure participation." 7 U.S.C. § 2019(e)(5). While the Secretary should be allowed wide latitude in determining what action is necessary for effective outreach, virtually all of the outreach plans submitted reflect deficiencies which, in the absence of evidence to the contrary, this Court concludes represent clear and substantial non-compliance with the statute.

Nine states had outreach plans approved which failed to provide or specify any employees' time and travel expenses qualifying for federal reimbursement after the approval of the outreach plan. It does not require any special administrative expertise to conclude that an effective outreach plan will require some individual's time, effort and travel. In some instances in which federally reimbursable time was incorporated in the outreach plans, the amount of time was so insignificant as to be an obvious deficiency. For instance, in the State of New York in which almost 675,000 persons potentially eligible for federal food assistance were not receiving it, the approved outreach plan called for a total expenditure of only $1,774 for federally reimbursable outreach efforts—$1,108 of which was U.S.D.A.'s 62½% federal reimbursement share. Such a plan appears so under-funded that it cannot be described as one requiring effective action to insure poor people's participation in the program. Indeed, during the period from April, 1972 to the end of fiscal 1973, participation in that state's food stamp program declined by over 33,000 persons.

In the State of Oregon, the outreach plan finally approved by the Secretary provided for only five percent of the state director's time, one percent of the time of his secretary (24 minutes a week), and ten percent of the time of a volunteer coordinator. It defies rational explanation how anybody could conclude that effective action could be expected from a plan in which so little time of state officials is invested. At the time there were more than 90,000 impoverished persons in Oregon eligible for food assistance who were not receiving it. Indeed, food stamp participation in those counties in Oregon on the program during the fiscal year at issue declined by nearly eight percent.

■ The outreach plans themselves conform generally to the format required by the FNS Outreach Instructions (Exhibit 20). To that extent the Court acknowledges that the states have complied with the administrative directives. However, with respect to most, if not all, of the plans contained in the record in this case, the Court must note that it would be difficult if not impossible for any person, be he or she an employee of the Department of Agriculture or a judge, to read the plan and make any reasoned determination whatsoever that the plan submitted would or would not undertake effective action to insure greater food stamp participation. Obvious questions which are not answered in the submitted plans concern the number of persons eligible for but not participating in the program, whether the plan for action could realistically be expected to provide for participation of all eligible persons, the extent, if any, of coordination which will be provided by the state director (indeed, half of the plans do not provide for some full-time person to be in charge of the outreach effort), and in the case of states asking for no federal money, the manner in which effective outreach could be accomplished without federal financial participation. Taken as a whole, consideration of the outreach plans leads inescapably to the conclusion that the standard employed by the Secretary in approving outreach plans was not whether the plan would provide effective action to insure food stamp participation, but whether it fit the format. The Court cannot, in this situation, conclude that the Secretary's action comported with the statutory directive. While the Secretary must be allowed considerable discretion in implementing the outreach program, that discretion does not include the option to disregard considerations, such as those mentioned above, which are required by any reasonable construction of the statutory language.

In the following section of this memorandum, the Court notes that food stamp participation data demonstrates that outreach did not in fact occur in fiscal 1973. In connection with the outreach plans themselves, the record shows that federal financial participation was token participation during fiscal 1973. In the entire country, the federal share in outreach expenditures for all of fiscal 1973 was only $80,242.76. Ten of the states with food stamp programs in the Northeast Region alone had no reimbursable expenditures. This showing in light of the Congressional concern for an expanded program and the mandate of the Congress that effective outreach efforts be made, must be described as dismal. On the basis of the record before this Court, it is a result which is substantially attributable to inaction and the encouragement of inaction on the part of the Department of Agriculture and its high officials. By their failure to demand the effective outreach action called for by Congress, the defendants have acted contrary to law and outside of the scope of their permissible discretion.

IV

■ Since this action deals directly with the failure to spend some $280 million in funds appropriated for the food stamp program for fiscal year 1973, deficiencies in outreach efforts and outreach plans would be immaterial if, during that year, the purposes of the Food Stamp Act had been adequately met

without expenditure of the surplus funds. However, the data presented to the Court indicates that food stamp participation in fiscal 1973 was essentially static and that the needs of millions of persons remained unmet.

The plaintiffs have submitted numerous exhibits to the Court which analyze food stamp participation during the year in question. The defendants have not challenged the accuracy of that data nor the method of analysis followed by the plaintiffs. These exhibits, in general, have taken the results set forth in Hunger—1973, a report by the staff of the Senate Select Committee on Nutrition and Human Needs, 93d Cong., 1st Sess. (May, 1973), which detailed participation in the food stamp and commodities distribution program[2] in April, 1972 and compared those results with the participation rate in June, 1973. They have also compared food stamp participation rates with the numbers of low-income persons eligible for the program.

From April, 1972 to June, 1973, participation in the Food Stamp Program increased by 690,000 persons, but this increase was more than offset by a decline of over 893,000 in the Commodities Distribution Program. The U.S.D.A., in fact, openly acknowledges that increases in food stamp participation represent a change-over by counties from the Commodities Distribution to the food stamp program. (See Exhibit 21) Taking these two federal food programs together, there were fewer people receiving federal food aid in June, 1973 than in April, 1972. Considering food stamp participation alone, there was a decline in participation in 17 states from April, 1972 to June, 1973 of a total of approximately 345,000 persons.

Additional data presented to the Court considers the extent of participation of counties in the program as of April, 1972. On a nationwide basis, the increase in participation between April, 1972 and June, 1973 was 124,927—a change of 1.1 percent. For the period from June, 1972 to June, 1973, the increase in the counties participating in the food stamp program continuously through fiscal 1973 was only 6,613 persons—an increase of 0.056 percent. In addition, in April, 1972, approximately 12.7 million persons eligible for either the food stamp or the commodities programs were not participating in the program—approximately 48 percent of the nation's poor. No substantial change had occurred in this figure by the end of fiscal 1973.

As of June, 1973, furthermore, 13 of the 47 states participating in the food stamp program provided food assistance to less than 40 percent of the eligible poor in their state. Twenty-six of these 47 states provided such assistance to less than half of the potentially eligible persons. There were 21 states participating in the food stamp program which had more than a quarter of a million persons eligible for the federal food aid who were not receiving it.

The Hunger—1973 report by the Senate Select Committee staff designated 1,062 counties which had a relatively sparse concentration of poor persons but, nevertheless had less than one-third of the eligible poor in the county receiving federal food assistance. In April, 1972, 725 of these counties were operating in the food stamp program. A random selection of 99 of these latter counties showed that in June, 1973, 81 of them still provided food stamps to less than one-third of the poor and in more than half of them participation in the food stamp program had declined.

The conclusion is inescapable that on a nationwide basis as well as in the counties in which participation had been the poorest the purposes of the food stamp program had not been fulfilled during fiscal year 1973. The Court must conclude that, throughout fiscal

2. The commodities distribution program, 7 C.F.R. §§ 250, 251, establishes a system of distribution of agricultural surplus foods to needy persons. The Food Stamp Act provides that the commodities program and the food stamp program may not operate simultaneously in the same area except in special circumstances. 7 U.S.C. § 2013(b) (1970).

1973, there were substantial numbers of indigents—many millions of them—who were eligible for the food stamp program but who did not receive such aid. There is no basis in the voluminous record before this Court for any suggestions whatever that the defendants undertook and required effective action to insure the participation of these eligible poor.

## V

As was indicated earlier, the plaintiffs also challenge the adequacy of the coupon allowances insofar as they are based on the Economy Food Plan and the failure on the part of the Secretary to update the standards based on the Economy Food Plan in light of the substantial increase in the cost of food in fiscal 1973. The former issue was raised in Rodway v. United States Department of Agriculture, 369 F.Supp. 1094 (D.D.C.1973) on remand from 157 U.S.App.D.C. 133, 482 F.2d 722 (1973). This decision is again on appeal to the Court of Appeals. It appears to the Court that if that claim prevails in *Rodway*, the benefits would be shared by all food stamp recipients throughout the country. It appears preferable, furthermore, to have that issue decided in a forum where the issues have been thoroughly explored. Because the *Rodway* Courts have already considered this issue and since this Court concludes that the Secretary's failure to implement the outreach provisions provides a basis for the relief requested, therefore, this Court will not rule on the merits of that claim.

The third alleged failing of the defendants in administering the food stamp program is their failure to provide benefits high enough to provide a nutritionally adequate diet. In fact, plaintiffs contend that the benefits were not even high enough to enable individuals to purchase the Economy Food Plan, which plaintiffs claim does not meet the standard of nutritional adequacy. The facts bear out plaintiffs claim that the level of benefits supplied was, due to the

rising cost of food during the fiscal year, inadequate to purchase the Economy Food Plan, and may in fact have been inadequate to enable many families dependent upon food stamps to obtain a nutritionally adequate diet.

With respect to the level of benefits which the Secretary must set, the statute, as it pertains to the fiscal year in question, provides that the face value of the coupon allotments are to be "in such amount as the Secretary determines to be the cost of a nutritionally adequate diet." 7 U.S.C. § 2016(a). Once established, the statute required the face value to be adjusted annually to reflect changes in food prices as logged by the Bureau of Labor Statistics of the Department of Labor. Plaintiffs do not deny that such annual adjustments have been made. They rely on the strong policy statements of the Act, however to impose upon the Secretary the duties of seeing to it that the amount of the annual increase is determined close to its effective date and of increasing the allotments more frequently than annually when food prices rise at an unusually high rate.

During all of fiscal 1973, for example, the face value of the food stamps available to an eligible family was based on the cost of food in December of 1971. When the allotments began in the beginning of the fiscal year, therefore, the cost of food was already six months out of date and by the end of the fiscal year, the allotments were 18 months behind the rising cost of food. In December of 1971, the price index of the Bureau of Labor Statistics for the seasonally adjusted cost of food at home, which uses 1967 as a base year with a value of 100, was 118.6. By July of 1972, when food stamp recipients began receiving the new allocations, the index had already risen to 121.2 and at the end of the fiscal year, June, 1973, the index had jumped to 139.2. For the last month of the fiscal year in which the allotments based on the December, 1971 food prices were in effect, therefore, seasonally adjusted food prices at home had risen

some 17.4 percent over the price of food in December, 1971.

■ Plaintiffs allege that, in the face of the skyrocketing cost of food, especially in the latter part of fiscal year 1973, and the surplus predicted well in advance of the end of the fiscal year, that the defendants should have taken steps to raise the level of allotment. The statute provided, however, that the face value of coupons which may be issued to a household shall be adjusted annually. 7 U.S.C. § 2016(a) (1970). While the language of the statute expressly gave the Secretary discretion to determine the cost of a nutritionally adequate diet, there was no indication in the statute that the Secretary had the discretion to change the allotments more often than once a year. It is not disputed that the Secretary has changed the allotment annually, semi-annually when the statute was amended. Thus, it cannot be said that the Secretary violated the statute by failing to make changes in the level of benefits more often than the statute requires.

Plaintiffs also question, however, defendants practice of basing the annual adjustment on the cost of food in December of the year prior to the effective date of the change in July. This issue has been rendered moot, however, by recent amendments to the Act which provide for semi-annual adjustments on the face value of the coupon, and require that the allotments for January 1, 1974, incorporate changes in the cost of food through August 31, 1973. Thus, the statute itself now provides for a minimum lag time of four months and benefit levels attributable to the former policy no longer exist.

## VI

In preceding sections of this memorandum, the Court has already determined that the Secretary's action and inaction in regard to outreach was inconsistent with the statutory standard. The Court has found that although there were millions of persons eligible for the program in fiscal 1973 who were not re-ceiving food stamps, the outreach activity the Secretary of Agriculture and his subordinates engaged in can be described as minimal at best. The question remains whether relief in the form of an order requiring expenditure of the surplus funds of approximately $278 million is appropriate.

This case is one of many which have arisen in the past two years in which the Courts have been faced with executive decisions, in one form or another, to refuse to spend funds. *See e. g.,* State Highway Commission of Missouri v. Volpe, 479 F.2d 1099 (8th Cir. 1973); Campaign Clean Waters, Inc. v. Train, 489 F.2d 492 (4th Cir. 1973); Gaudamuz v. Ash, 368 F.Supp. 1233 (D.D.C. 1973); Commonwealth of Pennsylvania v. Weinberger, 367 F.Supp. 1378 (D.D.C.1973); National Council of Community Mental Health Centers, Inc. v. Weinberger, 361 F.Supp. 897 (D.D.C.1973); City of New York v. Train, 494 F.2d 1033 (D.C. Cir. 1974), cert. granted; Commonwealth of Pennsylvania v. Lynn, 501 F.2d 848 (D.C. Cir. 1974); Berends v. Butz, 357 F.Supp. 143 (D.Minn.1973); Sioux Valley Empire Electric Ass'n. v. Butz, 367 F.Supp. 686 (D.S.D.1973).

■ Through all of these impoundment cases, which deal with a diverse number of federal statutes and programs, there is one common thread. These cases make it clear that administrators of Congressionally established programs have the authority only to do what the Congress directs or permits, and that administrators lack the authority, for whatever reason, to thwart the will of Congress by failing or refusing to follow Congressional directives. In those cases in which the Court found that administrative action inconsistent with Congressionally established purposes and standards resulted in the non-expenditure of funds, a course of action has been required which was consistent with implementation of the Congressional purpose. *See e. g.,* Highway Commission of Missouri v. Volpe, *supra.*

■ In the present case, the Court has found that the Secretary failed to

act in accordance with the outreach provisions of the statute. His actions frustrated and thwarted the will of the Congress. As a result, effective action to insure the participation of the many persons eligible for the food stamp program did not take place during fiscal 1973 and $280 million appropriated by the Congress to meet the nutritional needs of poor people went unspent. By his inaction in outreach, the Secretary impounded that money as effectively as he would have done had he proclaimed publicly that he would not implement the program to the extent authorized by the Congress.

The Court is compelled in such circumstances to order the Secretary to use these funds already appropriated by the Congress for the purpose intended—to provide for expansion through effective outreach efforts of a program designed to alleviate hunger and malnutrition by increasing the food purchasing power of low-income households. To do less would be to allow the Secretary to disregard the rule of law. The elected representatives of the people have established the law. It is the Secretary's responsibility and duty to implement that law. When it is demonstrated that he has failed to do so, it is the responsibility of the Court to require compliance with the standards set by Congress.

In the present situation, funds in the amount of approximately $278 million are now held by the Secretary subject to such disposition as this Court may order. Since this action was commenced, the Congress has amended the Food Stamp Act to provide that funds appropriated under that Act continue to remain available until expended. 7 U.S.C. § 2025(a). Even apart from that amendment, this Court would order expenditure of the surplus fiscal 1973 funds for the purpose of further implementation of the Act. In light of the intent of the Congress in amending section 2025(a) to allow appropriated food stamp funds to remain available until expended, it is consistent with the Food Stamp Act for this sum of money to be used for the purposes for which it was originally intended.

An order for expenditure of the funds, however, may not in itself provide the full relief to which the plaintiffs are entitled. They have asked this Court to require the defendants to submit a plan for expenditure of this money for approval by the Court.

If the Secretary and his subordinates were to require of the states implementation of the statutory outreach requirement, the obvious need for this form of federal food assistance would readily lead to expenditure of the sum involved here. Therefore, the Court concludes that a plan for expenditure of this money would, in itself, serve no useful purpose. However, the fact that the Secretary has not required compliance with statutory outreach requirements is evident from the record in this case. Therefore, rather than a plan for expenditure, the Court concludes that the relief appropriate in this action is to require the Secretary and his subordinates first to reassess the existent outreach plans and the implementation of those plans by the several states to determine whether the action proposed and taken by the states is consistent with the statutory requirements and the opinion of the Court and, secondly, to submit within sixty days a report detailing the findings made with respect to the adequacy of the plans, the adequacy of implementation action and the remedial action taken by the defendants. Such an order is a modest step to assure compliance by the defendants with their obligations under law. Accordingly,

It is ordered:

1. That the defendants' motions to dismiss and for summary judgment are denied.

2. That the plaintiffs' motion for summary judgment is granted to the extent that this Court declares that the defendants have failed to fulfill their statutory obligations and have acted outside

the scope of their statutory authority and responsibility in that they failed to take effective steps for proper implementation of the outreach requirements of the Food Stamp Act of 1964, as amended, for the period up to and including fiscal year 1973.

3. That defendants herein, their successors in office, agents and employees shall take all measures necessary to make available for present expenditure all surplus funds from the appropriation for the Food Stamp Program for fiscal year 1973 which have been retained as an obligated balance against said appropriation pursuant to the order of this Court dated June 25, 1973.

4. That the defendants herein, their successors in office, agents and employees shall:

a) Review all food stamp outreach plans submitted by the several states as defined in 7 C.F.R. § 270.2(uu), to determine whether they comport with the standards for outreach established by the statute and this opinion, and,

b) In all instances in which state outreach plans are found by the defendants, their successors in office, agents and employees to be inconsistent with the standards for outreach established by the statute and the opinion of this Court, require the state agencies involved forthwith to submit a revised outreach plan, and,

c) Forthwith review the implementation of outreach plans in the several states, as defined in 7 C.F.R. § 270.-2(uu), and take all appropriate action to require implementation of outreach efforts in a manner consistent with the statute and the opinion of the Court, and,

d) No later than sixty days from the date of this Court's order submit to the Court for review, with a copy to counsel for plaintiffs, a report detailing the actions taken in compliance with the Order of this Court.

5. That the plaintiffs are entitled to their costs and disbursements to the extent authorized by law.

Let judgment be entered accordingly.